## MURRAY HUMPHREYS, PETITIONER, *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 87899.   Promulgated October 8, 1940.

*E. J. Hess, Esq.*, for the petitioner.
*John D. Kiley, Esq.*, for the respondent.

862

[redacted]

OPINION.

TURNER: The issues in this case are issues of fact and the conclusions reached are drawn from the testimony of certain witnesses and supporting documentary evidence. The testimony of some of the witnesses is conflicting and can not be reconciled. Other witnesses were greatly agitated and from their manner on the witness stand and their testimony as it was given the conclusion was inescapable that they were not telling the whole truth, if in fact they were telling the truth at all.

Except for a deduction described as "Business Auto Expenses" which the respondent has disallowed, all items in issue are items of additional income claimed by the respondent to have been received by the petitioner during the years in question and not reported in his returns. All such items were included by the respondent in his determinations of deficiency except the $50,000 kidnaping ransom, which was set up affirmatively in his amended answers. With respect to all such items of additional income, it is petitioner's contention either that he did not receive such income or it was included in the unidentified income shown on his returns. In his returns filed for 1930, 1931, and

1932, the years before us, he reported gross income in the amounts of $10,360, $25,380, and $20,800, respectively, but, except for $1,500 received from General Market House in 1930 and $1,300 received from the same source in 1931, the source or sources of income reported were not shown, neither was there any disclosure of the consideration or the nature of the services, if any, for which the income was received. At the hearing petitioner made no serious effort to explain or identify all of the income reported, nor did he submit evidence which would permit us to make any accurate check of his claim that all of his income was reported. He asks us, however, to take his word that the various items of income now admitted by him were included in the lump sums shown on the returns filed. He denied all knowledge or ownership of the M. L. Brunswick bank account and has undertaken by other witnesses to show its ownership in another person. He also denied participation in the Fitchie kidnaping and called several witnesses for the apparent purpose of discrediting the Government witness who testified that he saw petitioner take the said $50,000 of ransom money.

Petitioner was generally regarded as a gangster and racketeer and on the record here we are unable to reach a contrary conclusion or to find that he was engaged in any legitimate business. On his returns he has described his occupation, profession, or business variously as "Restaurant", "Inspector", "Superintendent", and "Executive", but obviously it was not intended by his returns to make a frank disclosure of his activities or to furnish the Government any basis for checking their accuracy. He was not even frank with the accountant who prepared the returns. When during the latter part of 1931 and the early part of 1932 Janzen was preparing petitioner's returns for 1931 and prior years, petitioner advised Janzen that he could not remember any source of income other than General Market House, and yet he now admits that during the period when Janzen was preparing the returns he was receiving $50 to $100 per week from the New Drexel Cleaners and $100 to $150 per week from a man referred to as Ben Swieg.

Petitioner's testimony at the hearing is little more enlightening. In 1928 he was receiving $50 per week for "just hanging around with this Dave Ostran and them." During 1929 and part of 1928 he was running a restaurant wherein he sold beer and liquor. In 1930 he described himself as an "arbitrator" for the six dry cleaning establishments enumerated in our findings, but, except possibly for some activity in connection with a strike at the Michigan Cleaners in the spring of 1930, he does not make the subject matter of his "arbitrating" definite or clear. His testimony with respect to the "services" rendered the New Drexel Cleaners in 1931 and 1932 is too indefinite to be of any assistance here. He was definite, however, about calling at the plant each week for his pay. During 1931 and 1932 petitioner states that he

was also receiving weekly payments from Ben Swieg, but in so far as we can determine, and to borrow the expression used by petitioner in describing his activities during part of 1928, the weekly payments in 1931 were for "just hanging around." In 1932 he claims to have been looking after Swieg's "interests" in the Meadowmoor Dairy, of which enterprise petitioner claimed to be the "brains." During the course of his testimony he talked of "this deal" and "that deal", which may at times have referred to the arrangement with the six cleaners or that with the New Drexel Cleaners in 1931 and 1932, but even on his own testimony we are not justified in concluding that he was not engaged in other "deals" which have not been accounted for. In the fall of 1932 he claims to have been interceding with the Chicago Teamsters Union in behalf of a coal concern on some matters involving the dumping of coal, but we are not further advised as to the nature of the "deal" or what remuneration, if any, was received in connection therewith. Petitioner also testified to numerous conferences at the Mallers Building and various hotels, including conferences for which he used Swieg's suite at the New Southern Hotel and which would sometimes occur "every day for a month straight." The testimony of representatives of the six cleaners tends to support the conclusion that most, if not all, of these conferences must have had to do with activities of petitioner other than the "deal" with the said cleaners and New Drexel. The impression from these witnesses is that there was no occasion for them to do anything but pay.

Aside from the nature of his activities, however, a stock answer of petitioner concerning unexplained income was that such amounts were in fact gifts. To illustrate: One man "gave" him a 12-cylinder Cadillac costing $3,900; another "paid" some $3,700 to $4,200 on a 16-cylinder Cadillac; while still another "paid" approximately $3,300 for furniture for petitioner's apartment; and Ed Oslan "gave" him a one-third interest in the New Drexel Cleaners.

We followed petitioner's story attentively and carefully while he was on the witness stand and we have since reviewed his testimony in detail, but it is too indefinite, vague, and evasive to be of material assistance to us in determining the merits of his contentions. The petitioner does not lack intelligence and we are convinced that he had sufficient understanding of the matters to be determined in this proceeding to realize the necessity for giving a frank and complete story of his activities during the years in question and of the remuneration received therefor if there was a basis in fact for his contentions. Such frankness as was displayed, however, was in the main directed to those matters with respect to which the respondent's determination was supported by conclusive or irrefutable evidence and not to matters which would supply us with facts sufficient for determining his true income. Under

the circumstances we find it impossible to place reliance on any of his testimony except such portions as may be corroborated by other and credible evidence, or such as may be in the nature of admissions. Various inconsistencies and contradictions in his testimony will become more apparent as the specific issues are disposed of.

For the year 1930 the only item at issue consists of the payments received from the six dry cleaning establishments previously named in our findings of fact. Petitioner admits that the payments to be made by these cleaners amounted to $10,000, but he contends that of that amount he received only $5,000 and that the sum so received was included in the unexplained income reported on his return. It is the Government's position that the petitioner received the full $10,000 and that he has not shown that any part of that sum was reported on his return.

According to petitioner's story he was approached by Harry Heiter, who asked him if he would take the "job." Heiter was accompanied by a man referred to as Jack McGurn. Just how Heiter and McGurn were interested in or connected with the dry cleaning business petitioner did not explain. Heiter had been a bartender in the restaurant operated by petitioner in 1928 and 1929 and both Heiter and McGurn were violently killed at some later dates. Heiter advised petitioner that the cleaners were willing to pay $10,000 a year if he "could straighten out the situation." Petitioner's explanation was that the plants were cutting prices and picking up one another's stops and "they didn't want the union to take sides" or "go out and tie them up" and that the protection for which the plants were to pay was protection from trouble "with other plants." According to petitioner, Ginsberg represented the six cleaners, collected the pay, and sent $100 per week to him by Heiter. Even on petitioner's testimony, however, it would be difficult to conclude that Heiter's part in the arrangement was exactly as outlined above. Petitioner did not need Heiter to bring him and Ginsberg together. They had known each other "four months or so" and had "become quite friendly * * * and used to sit down and discuss his [Ginsberg's] affairs at times."

From petitioner's account of the deal we might gather that his activities in connection therewith consisted of the following: The visit to Bendel, head or president of the Cleaners & Dyers Drivers Union to inquire if he had anything against the cleaners in question and if it would be all right if he, Humphreys, should take the "job"; the collection of his weekly pay; possibly some participation in two conferences between Michigan Cleaners and the inside workers; some conferences with the six establishments over prices; and when the "union would complain" the sending of "Harry [Heiter] or Jack McGurn to talk to Dr. Gaines [Ginsberg] and get the plant to go along according to their

word." He visited none of the plants himself except the New Drexel and International, the trip to the latter being to see about one of its weekly pay checks that had "bounced."

On cross-examination, however, and in connection with questions as to his relations with Al Capone, the petitioner gave another version as to the origin of his "deal" with the six dry cleaning establishments. Following is an excerpt from the transcript of the petitioner's testimony on the matter:

Q. * * * In your affiliations with this dry cleaning industry in the settlement of their labor disputes, were you acting in your own behalf or were you acting in behalf of Al Capone or somebody else?

A. No, I was acting in my own behalf.

Q. In whose behalf were you acting?

A. Well, this Ben Swieg was the man that had the deal, and he would refer them to me and they would come to him, and finally I handled that one deal and then from then on they had confidence in me, and I would always try to be fair on it, and that is how Mr. Williams and myself broke off, because I wouldn't go along with the labor end of the deal, and we just dropped them. We left him out, and I used to go along on those same bases after that with the deal.

Q. Well, maybe you misunderstood me, but I am trying to find out what your answer is to the fact of whether or not you were representing the Al Capone organization or were you independent from Al Capone and his organization?

A. Mr. Ben Swieg was connected with Teddy Newberry in a way, and it was really them that were handling this.

Q. Well, was he affiliated with the Capone organization?

A. In an offhanded way, I guess, some way.

Q. There was a connection between the two, wasn't there, without going into the details?

A. Well, there was like a friendly feeling, like I guess. They would go and talk to each other and such as that, and I have talked to Al myself, but I don't think there was anything in the way of money, on the money end of the business. I think it was just like straightening out difficulties between them.

Q. I see. This money that you spoke of that you got, that never reached Al Capone, did it? That went to you and you kept it, is that correct?

A. The $10,000?

Q. Yes.

A. That is correct.

Q. That was kept by you and your associates. It never reached Al Capone?

A. That is right.

Q. You were a member of the Al Capone organization at the time though, weren't you?

A. No Sir. * * *

Q. You were not. That is what I want to find out. You were acting independently?

A. Well, I was friendly with Al.

Q. Friendly?

A. I used to go up there. I used to like to go up there to talk with him, and things, but I had no affiliations.

At one stage in his examination the petitioner described Ben Swieg as a druggist who was interested in playing the stock market. At

another time he testified that Swieg was trying to gain control of the Master Cleaners Association. He also testified, as we have already noted, that it was Swieg who had the financial interest in the Meadowmoor Dairy but that it was he, Humphreys, who was the "brains" of the venture. We are not certain that there really was a man by the name of Ben Swieg or, if there was, whether he played the part in petitioner's operations that petitioner would have us believe. From the things that were happening in the dry cleaning industry, however, we have no reason to doubt that there was a move to gain control of the Master Cleaners Association and very likely petitioner's "deal" with Ginsberg was connected with it.

Representatives of several of the cleaning establishments testified on behalf of the Government. The purport of their testimony was that the payments were made for what is generally known as "protection." According to their story they were having serious labor trouble toward the end of 1929 and Ginsberg, at a meeting called by him, suggested that "he had a certain party who had influence with the unions" and he would talk to the party and the cleaners wouldn't be molested any more. A week later he reported that he had spoken to "that party" and that the total amount to be paid was $10,000. As long as they made their payments they were not molested. None of these witnesses mentioned the name of Harry Heiter. One had heard of McGurn's name, but said it was Humphreys who was furnishing the protection. They were certain that the matter of prices being charged for cleaning did not have anything to do with the "employment" of petitioner and no indication was given that they were having trouble among themselves or that they experienced any such trouble during the year 1930 as the petitioner claimed. Williams of Michigan Cleaners testified that a strike was called at his plant in March of 1930, which was finally settled through an agreement with the inside worker's union. He did not indicate what, if anything, the petitioner had to do with the strike or the settlement, but did state that because of failure on the promise to give protection the Michigan Cleaners, in April 1930, stopped making the weekly payments and shortly thereafter they were threatened by Ginsberg and another man. From petitioner's testimony we gather that the other man was McGurn. Subsequently, in the early morning of August 5, 1930, the plant of the Michigan Cleaners was broken into and clothing was damaged with acid to the extent of $20,000.

We are of the opinion that the payments by the six cleaners were made for what is generally known as "protection", as their representatives indicated from the witness stand, and that bona fide labor troubles had very little to do with it. It is our conclusion also that petitioner was the principal in the "deal" here under consideration, with

the possibility that he did have the cooperation of some other person or persons who were seeking to gain control of the Master Cleaners Association. We have no doubt that he received the $10,000 of "protection money" which the cleaners paid and we so conclude. It may be that petitioner used Harry Heiter and Jack McGurn for various purposes in making collections from the cleaning establishments and that they received some pay from petitioner therefor, but petitioner is not here claiming a deduction for salaries or wages and under the circumstances described he would not be entitled to such deduction if a claim therefor had been asserted. *Frank A. Maddas,* 40 B. T. A. 572; affd., 114 Fed. (2d) 548.

The remaining question as to the income received from the six dry cleaning establishments is whether or not the $5,000 of such income which petitioner admits he did receive was included in the unidentified income reported in his 1930 return. When Janzen was preparing the return petitioner denied any recollection of the source of any income other than that received from the General Market House. On petitioner's representations that all of the income received by him during the year had been expended during the same period and on further representation that he had advised Janzen of all his expenditures for the year, Janzen entered on the return as petitioner's total income the total of the expenditures of which he was advised, plus the $1,500 received from the General Market House. Aside from Janzen's testimony that he verified the correctness of the sum received from the General Market House, we have only the testimony of the petitioner to the effect that except for possibly a few hundred dollars his total income consisted of the sum received from the General Market House and $5,000 received from the six dry cleaning establishments and that any amounts reported in excess of the items mentioned were "gifts" which had been included through a desire to omit nothing that might properly be considered as income. In the light of what we have previously said with respect to petitioner's testimony, we are unable to place sufficient reliance thereon to justify the conclusion that he advised Janzen of all expenditures during the year, to say nothing of justifying the conclusion that any part of the $10,000 received by him from the six dry cleaning establishments was included in the unexplained income reported, and we are not even lightly impressed with the explanation that any of the money or property received in connection with his activities may properly be classified as gifts.

With respect to the $2,600 received in 1931 and the $5,200 received in 1932 from the New Drexel Cleaners, the petitioner's contention is the same as that with respect to the $5,000 which he admits he received in 1930 from the six dry cleaning establishments, namely that such sums were received but were included in the unidentified sums reported

on his returns for the years 1931 and 1932. For the reasons just expressed with respect to the $5,000 item in 1930 we are unable to sustain petitioner's contention, and the respondent's determination that these items are in addition to the income reported for the years 1931 and 1932 is sustained.

In his determination for 1931 the respondent increased petitioner's income by $5,000, described in his notice of deficiency as "Drexel Cleaners Investment—$5,000." He apparently arrived at his conclusion that this item represented additional income by the same method as was used by petitioner in making his return, namely by concluding that an expenditure indicated a corresponding realization of income. The petitioner's allegations as to this item are not definite or clear. The facts alleged in the petition accept the conclusion that such an investment was made by petitioner, but a possible inference may be drawn from the allegations of fact relating to the issue for 1930 that the interest was acquired in that year and not in 1931.

The books of the New Drexel Cleaners could not be found and oral testimony was heard as to what they contained on the matter here under consideration. One of respondent's agents testified that he had examined the books and had found an account headed "M. L. Humphreys, Investment" and a credit entry shown as of July 1931 in the amount of $5,000. The individual who had kept the books during that period was called on behalf of petitioner and testified that she had never known of or seen any such account in the books. On brief petitioner's counsel has devoted most of his argument on this issue to the proposition that the books of the New Drexel Cleaners did not contain such an account or entry and if it did the petitioner had no knowledge of it and it would not be binding on him.

In our opinion it makes little difference whether or not the New Drexel books contained such an account or such an entry. The petitioner from the witness stand has admitted that he did acquire such an interest and he thinks it was acquired in 1931. He claims however that it was a gift and denies that he paid any money therefor. Based on petitioner's admissions with respect to the matter, it is our conclusion that Oslan, being afraid of trouble for his cleaning establishment, transferred the interest to petitioner in return for petitioner's promise to continue for the New Drexel Cleaners the same "protection" that had been given the six cleaning establishments in 1930. There is no contention that the interest so acquired did not have a fair market value of $5,000 and the record is devoid of any evidence that it did not. The determination of the respondent increasing petitioner's income in that amount is accordingly sustained.

On the basis of a payment made by petitioner to Janzen in the amount of $1,500 for services rendered in preparing petitioner's

income tax returns for 1931 and prior years, the respondent has increased petitioner's income for 1931 by the amount of that expenditure. From the evidence however it appears that the expenditure was made in 1932 and not in 1931 as indicated by the determination. We accordingly conclude that this expenditure did not reflect the receipt of additional income by petitioner in 1931.

In his determination of the deficiencies for 1931 and 1932 the respondent has included as income the sums of $29,812.82 and $52,776.81, respectively, representing the deposits made during those years in the bank account with the Sears Community State Bank of Chicago, Illinois, under the name of M. L. Brunswick. The petitioner contends that he did not open the bank account, that it did not belong to him, and that he did not have any interest in any of the sums deposited there.

Shortly after respondent's agents began their investigation of petitioner's income tax liability in August 1932, they discovered that two payments of $232 each on a Lincoln sedan purchased by petitioner had been made by checks drawn on the M. L. Brunswick account at the Sears Community State Bank. While at the bank they questioned Michael Bolker, cashier of the bank, as to the identity of the party who had opened the Brunswick account, but they were unable to obtain anything definite from him.

In May or June of 1933 Bolker was called to testify before the grand jury concerning petitioner's connection with the Brunswick account and in the course of his testimony stated that petitioner was not the man who had opened the account. When he returned to the bank and advised its officials what had occurred, counsel was employed and the president of the bank made an appointment with the U. S. District Attorney. The conference so arranged took place some two days later and was attended by Bolker, his attorney, the president of the bank, the district attorney, one or more of his assistants, and at least one revenue agent. At that conference and after examining pictures of petitioner, Bolker, acting under advice of counsel, stated that it was petitioner who had opened the account. The following day he went back to the grand jury and asked that he be permitted to correct his testimony. He then testified that it might have been Humphreys who opened the account. Thereafter the grand jury returned the indictment against petitioner for willfully, knowingly, and feloniously attempting to evade his income taxes for the years 1931 and 1932, and on October 26, 1934, petitioner pleaded guilty to the indictment so returned. One of the aliases under which he was indicted was M. L. Brunswick, and the deposits in the Brunswick account here in question were included in the income with which he was charged in the indictment.

At the hearing in this proceeding Bolker, called as a witness by petitioner, repudiated the statements made by him at the conference in the district attorney's office and stated that the testimony given by him on his second appearance before the grand jury was false. He testified further that the account was opened by a man now known to him as Lefty Leventhal. Petitioner also called Charles and Peter Ziff who operated a bottle and bottle supply business under the name of the American Bottle Corporation. The Ziffs testified that Leventhal bought bottles and bottle supplies under the name of M. L. Brunswick. Petitioner's brother, Ernie Humphreys, alias Jack Wright, testified that he worked as a salesman for Charles and Peter Ziff, that he handled the American Bottle Corporation account with Leventhal, and that Leventhal ran a paper supply business under the name of Troy Paper & Twine Co. at 3354 Ogden Avenue but bought bottles from the Ziffs under the name of M. L. Brunswick. The signature card at the bank gave the M. L. Brunswick address as 3215 Ogden Avenue. Two other witnesses called by petitioner testified to being familiar with a man known as Lefty Leventhal and connected him with numbers 3354 and 3215 on Ogden Avenue. Some of the above witnesses testified that for some time Leventhal had been operating a parking lot at 218 West Randolph Street. Bolker testified that he had seen him there some three weeks prior to the hearing in this proceeding, but that he had since gone to Florida to recuperate from an operation.

It was developed at the hearing that Peter Ziff opened an account at the Sears Community State Bank under the name of Ed Simson shortly after the Brunswick account was opened. Bolker handled the opening of this account and admitted he knew at the time that Peter Ziff's name was not Ed Simson. The opening deposit was $3,208.45 and was drawn from the M. L. Brunswick account. The explanation offered by the Ziff brothers was that "Brunswick" made payments on his account with them by endorsing over numerous small checks, many of which were returned, that they had knowledge that "Brunswick" was dealing with bootleggers and opened the account to keep the American Bottle Corporation account clear of such checks.

A number of the weekly payment checks received by petitioner from the New Drexel Cleaners cleared through the Ed Simson account. Ernie Humphreys claimed that he had cashed these checks for petitioner from collections made for the American Bottle Corporation and when his collections were turned in petitioner's checks were apparently deposited in the Ed Simson account. At least one of the New Drexel Cleaners' checks cleared through the M. L. Brunswick bank account. As to that check Charles Ziff and Ernie Humphreys testified that Leventhal had cashed it for Ernie Humphreys in the office of the American Bottle Corporation.

If the testimony of Bolker, Ernie Humphreys, and Charles and Peter Ziff is to be believed, we might justifiably conclude that petitioner has sustained his burden and shown that the M. L. Brunswick account was not owned by him, but by a man generally known as Lefty Leventhal. But after listening to the testimony of these witnesses as it was developed by counsel and after making some effort on our own part to elicit a full and complete story, we feel that only such portions of their testimony as is supported by other evidence or deal with matters about which there is no dispute may safely be accepted at face value.

Bolker now states that his identification of petitioner as the man who opened the Brunswick account and his revised testimony before the grand jury were due to threats of prosecution if he did not change his story. On cross-examination, however, he admitted he was told that if he did not tell the truth he would be subject to indictment and prosecution for perjury. He indicated at the hearing in this case that he understood the meaning of the term "perjury" and we are not at all impressed with any suggestion that he was misled by those present at the conference in the district attorney's office or that he changed his testimony before the grand jury under duress. He states that he learned that Leventhal and Brunswick were the same man from Brantman, petitioner's accountant, but that during the two years preceding the hearing in this case he has seen Leventhal on numerous occasions and has recognized him as the man who opened the Brunswick account. We were not favorably impressed with Bolker as a witness and, after listening to his story and observing his demeanor on the witness stand, we think it much more likely that his fear of indictment for perjury was because he had not told the truth when he first appeared before the grand jury and stated that it was not petitioner who had opened the M. L. Brunswick account. From Bolker's own story the conference in the district attorney's office was instigated by the president of the Sears Community State Bank after hearing of Bolker's testimony on his first appearance before the grand jury and when Bolker stated at the conference that it was petitioner who opened the account he was acting on the advice of counsel. It was within the two years preceding the conference that he, according to his testimony, had seen the man who opened the account appear regularly at the bank and from the description of Leventhal as given by him and other witnesses we do not consider it at all probable that any one, upon seeing petitioner or examining his photographs, could reasonably confuse him with the individual described as Leventhal. It is also to be noted that, in the face of his current denial on direct examination that petitioner was the man who opened the Brunswick account, he stated on cross-examination that it was possible that it was

petitioner. Bolker admitted that there were several accounts at the bank under what he termed "phony" names and we do not believe he was in the dark as to the Brunswick account, but for some reason he has sought to avoid telling the truth about it.

We are also convinced that the testimony of Ernie Humphreys and the Ziff brothers is no more reliable. Ernie Humphreys' explanation of his use of the alias "Jack Wright" was that he desired to avoid any impression that he was connected with or related to petitioner, due to the fact that petitioner was receiving such "unfavorable publicity" at the time. As his story was developed by counsel, however, it appears that he was associating with petitioner probably daily. According to his testimony he "would ride downtown" with petitioner "in the morning" and on such occasions petitioner would ask him to get checks cashed. He would also "run a lot of errands" for petitioner. At other times petitioner would "call and ask" him if he could cash a check. He would regularly run the checks through as collections on the M. L. Brunswick account and Charles Ziff at least has indicated that he was aware that Ernie Humphreys cashed checks for petitioner. In late 1932 petitioner obtained employment for Ernie Humphreys with the Meadowmoor Dairy, of which enterprise, as we have already noted, petitioner claimed to be the "brains." The Ziff brothers were most reluctant as witnesses and obviously would have been much happier if they could have refrained from testifying or had been permitted to completely insulate themselves with forgetfulness or lack of knowledge. They were particularly distressed when inquiries were directed to matters which might indicate some close relation with or knowledge of the petitioner or the business carried on under the name of Brunswick. We are convinced that Ernie Humphreys and Charles and Peter Ziff were thoroughly familiar with the "Brunswick" operations but have refused to tell what they really know.

In addition to the payments on the Lincoln sedan made by checks drawn on the M. L. Brunswick account, three such payments were made by checks drawn against another account at the Sears Community State Bank opened and maintained under the name of John Kelley. The Kelley account had been opened approximately 20 days after the opening of the Brunswick account. Petitioner's explanation of the payments made on the Lincoln sedan from the Brunswick and Kelley accounts was that he gave the money to cover the payments to Morey Gordon, a "very dear friend", but that he did not know how Gordon happened to make the payments by checks drawn on those accounts. Gordon was pointed out by petitioner and was present throughout the hearing but was not called to testify with respect to the matter.

Shortly after respondent's agents began their investigation of petitioner's income tax liability and at or about the time they began to display an interest in the M. L. Brunswick account at the Sears Community State Bank or to be specific, on September 26, September 28, and September 30, 1932, the balances on deposit in the Simson, Brunswick, and Kelley accounts were withdrawn and the accounts were closed.

From the undisputed facts and the conclusions of fact to be drawn from the evidence of record, a rather orderly and complete picture appears. The M. L. Brunswick account at the Sears Community State Bank was used in connection with the acquisition of bottles and bottle supplies for the bootlegging trade. As previously shown, the petitioner was not a stranger to the illicit liquor trade and there is no indication that his activities with Ben Swieg and Teddy Newberry in preying on the dry cleaning industry during 1930, 1931, and 1932 occupied his full time so as to require a severance of his interest in the liquor business. His brother, Ernie Humphreys, ostensibly a salesman for the Ziff brothers, had charge of their dealings with "Brunswick" and through him a number of petitioner's checks from the New Drexel Cleaners found their way to the Ziff brothers in payment for bottles and bottle supplies acquired in the Brunswick operations. These checks passed through the Simson account which the Ziffs say they opened to handle checks from the Brunswick business and it was shown that the opening deposit in the Simson account was $3,208.45 drawn from the Brunswick account. In our opinion it was no mere coincidence that the Brunswick, the Simson, and the Kelley accounts at the Sears Community State Bank were closed within four days of each other and shortly after the Government agents began to display an interest in the Brunswick account at the bank, and that the Brunswick operations apparently either were discontinued or transferred to another area. At any rate, even though Ernie Humphreys was ostensibly a salesman for the American Bottle Corporation and the Brunswick account was only one account under his supervision, he found himself in need of "some work" when or shortly after the Brunswick account was closed and it was petitioner who obtained employment for him at the Meadowmoor Dairy, another venture in which petitioner was then interested. It was shown that two of the checks used in making payment on petitioner's Lincoln sedan were drawn on the Brunswick account and no satisfactory explanation has been offered. It is also noted that "M. L. Brunswick" was one of the aliases listed in the indictment to which petitioner pleaded guilty on October 26, 1934. Numerous other lesser facts having to do with petitioner's habits with respect to the use of aliases, the maintenance of bank accounts under fictitious names, the initials used in

connection therewith, the resemblance in the writing appearing on the various checks, signature cards, and deposit certificates also tend to indicate petitioner's ownership of the M. L. Brunswick account.

Petitioner bases his strongest argument with respect to this issue on the testimony tending to show that a man generally known as Lefty Leventhal was connected with or carried on the Brunswick operations. We think it likely that there was a man known as Leventhal and that in some way he may have been connected with the Brunswick operations. The application to the city collector for the license to operate the parking lot at 218 West Randolph Street was placed in evidence and the signature thereon was Maurice L. Leventhal. The handwriting of that signature closely resembled the M. L. Brunswick endorsed on the check of the petitioner which Ernie Humphreys and Charles Ziff claimed was cashed by Leventhal in the office of the American Bottle Corporation. It also resembles the handwriting appearing on some of the M. L. Brunswick deposit slips. It does not resemble, however, the M. L. Brunswick appearing on the signature card at the Sears Community State Bank which Bolker testified was written thereon by the man who opened the M. L. Brunswick account. The most logical way of establishing Leventhal's exact status or connection with respect to the Brunswick operations would have been to have called him to the witness stand. It is true Bolker testified that Leventhal at some time during the three weeks preceding the hearing in this case had departed for Florida to recuperate from an operation, but it was also shown that petitioner's accountant, his brother, and others called to testify in petitioner's behalf had known of Leventhal's whereabouts for two years or more and it does not appear that any effort was made to call him as a witness. The character of the testimony on which petitioner relies to show that Leventhal was the party in interest in the Brunswick operations is on somewhat the same plane as petitioner's own testimony that Heiter was the real party in interest in the 1930 "deal" with the six dry cleaners. It is accordingly our conclusion that, whatever the part played by Leventhal in the Brunswick operations, it was no more substantial than that played by Heiter and McGurn in petitioner's "arbitration" work in the dry cleaning trade.

From the evidence of record we are convinced and so conclude that petitioner was the owner of the M. L. Brunswick bank account at the Sears Community State Bank and we accordingly sustain the respondent's determination that the deposits made in that account are chargeable to him as income. *Edgar P. Haney*, 5 B. T. A. 1039; *Alex Holmstrom*, 35 B. T. A. 1092; petition for review dismissed, 94 Fed. (2d) 747; and *Leonard B. Willits*, 36 B. T. A. 294. The records of the bank show that the total deposits made in that account for 1931 and 1932

were $29,812.82 and $52,776.81, respectively, as the respondent determined. At the hearing however the respondent introduced in evidence slips showing deposits made in that account during the two years, from which it appears that $480 for 1931 and $2,662.52 for 1932 represented the redeposit of returned checks. In computing the deficiency herein the total deposits should be reduced so as to eliminate the redeposits described.

By amended answer the respondent alleges that petitioner's income for 1931, as shown in the notice of deficiency, should be increased by the amount of $50,000 to include a payment received by him during that year as ransom for the release on December 23, 1931, of Robert G. Fitchie, president of the Chicago Milk Wagon Drivers Union, who had been kidnaped two days previous. The respondent has made claim for the additional deficiency which would result from the addition of the $50,000 payment to petitioner's income and has assumed the burden of proof with respect to this issue.

Robert G. Fitchie was president of the Chicago Milk Wagon Drivers Union, which position he has held for 32 years. He was born in Scotland but came to this country at the age of 7 years. At the time of the hearing in this proceeding his age was 74. He has been a citizen of the State of Illinois since 1889.

Fitchie testified that on the evening of December 21, 1931, after having driven home from his office, four men held him up with guns at the rear of his home and ordered him to get in their car. He was ordered to keep his head down so that he could not see his captors or know where they were taking him. After having ridden for about an hour and a half the car was stopped and he was ordered to get out. He was taken inside a building and placed on a couch. He was kept blindfolded almost continually. While he was held in custody he was compelled by his captors to write several notes to his business associates, one of which stated that $50,000 was the amount of ransom required. On the evening of December 23, after having been told that satisfactory settlement had been made, he was released several blocks from his office, still blindfolded. He did not have an opportunity to see any of his captors and he was unable to identify any of them.

Steve C. Sumner is secretary-treasurer of the Chicago Milk Wagon Drivers Union, which position he has held since 1928. He has served the union in various capacities, however, since 1902. He was born in Cleveland, Ohio, in 1849 and moved to Chicago in 1879, where he has since resided. He testified that on the evening of December 21, 1931, he and several other officials of the union, including Robert Fitchie, had planned to attend a theatre party, but before time to go to the theatre he learned that Fitchie had been kidnaped. He and some of the other officials of the union held a meeting that night at a downtown hotel to decide what could be done to obtain Fitchie's release

and to read and discuss a ransom note which had been left at his, Sumner's, home. The note had been written by Fitchie, wherein he stated that he had been kidnaped and that Sumner should make satisfactory arrangements for his release. Sumner was warned not to notify the police.

No word was received from Fitchie or his captors the next day, December 22, but on the morning of December 23 Sumner received a telephone call and a man told him to go to a certain address and get a letter that had been placed under the door of a vacant store. There was some misunderstanding about the address given and the telephone conversation lasted several minutes. Sumner proceeded to the address given and found the letter. It was another letter written by Fitchie stating that his captors demanded $50,000 for his release and that he (Sumner) would be instructed how to make the payment.

That afternoon Sumner received another telephone call and a man instructed him how and when to deliver the ransom. Sumner deliberately prolonged the conversation in order to try to remember the voice of the kidnaper. He obtained the $50,000 from the bank with which the union did business and, following the instructions given over the telephone, drove to a point on the east side of Hoyne Street approximately 20 feet from the entrance to McKinley High School. There he parked his car, locked all doors except the front right, left the $50,000 on the front seat and walked up the steps of the school building to a point about 25 feet from his car. It was a little after 3 o'clock in the afternoon and he stood among the pupils who were leaving the school building. He saw three cars park opposite his car on the other side of the street. Four men got out, two of whom remained in the middle of the street while the other two advanced toward his car. They tried the left hand doors which were locked and then proceeded to the other side of the car toward the school building. Sumner had previously seen the man who came around the rear of the car but at that time did not know his name. Subsequently and several months later he identified him by pictures in the newspapers as being George "Red" Barker, but not before Barker had been assassinated in gangland warfare. Sumner did not recognize the man who came around the front of the car and removed the ransom money from the front seat of his car. He did, however, pay particular attention to him for the purpose of future identification. After taking the ransom money the four men hurried to their cars and drove away.

About four or five months later, April or May 1932, petitioner came to Sumner's office to talk with him about obtaining drivers for the Meadowmoor Dairy. Sumner testified that as soon as he saw him he positively identified him, both by his voice and appearance, as being the man who had given him instructions over the telephone and the same person who came around to the front of his car and

took the ransom money. He made petitioner's identity known to Fitchie and suggested prosecution, but Fitchie was in ill health and through fear of his life would not consent to the prosecution. Sumner also made petitioner's identity known to John H. Lyle, Judge of the Municipal Court of Chicago. Judge Lyle testified that in or about June 1932 Sumner told him that he had identified petitioner as being the person who took the ransom money from his car, but that Fitchie would not consent to a prosecution. Subsequently Sumner also testified before the county grand jury on the matter, but no prosecution was ever instituted.

In May or June 1933 Sumner identified petitioner in connection with the kidnaping in his testimony before the Federal Grand Jury in Chicago and the $50,000 ransom payment was included in petitioner's aggregate income as shown in the indictment.

The only direct evidence as to the actual payment of the ransom money and its receipt by petitioner is the testimony of Sumner. From the witness stand petitioner denied that he participated in the kidnaping, that he had any connection with it, or received any of the ransom money. To support this denial petitioner called a number of witnesses in an effort to discredit Sumner and cast doubt on his credibility.

In general, the purport of the testimony of these witnesses was that the Chicago Milk Wagon Drivers Union and its members, with the knowledge or under the direction of Sumner, had frequently indulged in various lawless and destructive acts to prevent the establishment or conduct of any milk selling or delivering business in competition with the concerns already established and using as drivers members of the Chicago Milk Wagon Drivers Union. In this same connection there was an attempt to develop the thought that the desire to stifle competition was the reason for refusing to furnish drivers for the Meadowmoor Dairy, that Sumner was responsible for the refusal of drivers, and that Sumner's testimony here was motivated by petitioner's efforts to establish the Meadowmoor Dairy as a competing concern. One witness was called for the apparent purpose of indicating as the kidnaper a known but unnamed individual not the petitioner. From the testimony of two witnesses the inference is that the kidnaping was a "fake" or "framed." From other witnesses there was an attempt to show discrepancies in various statements previously made by Sumner with respect to the kidnaping and his meeting with and identification of petitioner as the individual who received the ransom money.

On brief counsel for petitioner states with respect to this issue "it is safe to say that his [respondent's] position is dependent on the truth or falsity of the testimony of the witness Sumner." In his argument as to Sumner's credibility and in addition to reviewing the

testimony summarized in the preceding paragraph, petitioner's counsel stressed the fact that petitioner was never prosecuted for the kidnaping of Fitchie and argues that it is strange that if Sumner had identified petitioner as the man who had taken the ransom money from his automobile, he did not swear out a warrant or urge prosecution. In that connection however we have already noted Sumner's testimony that Fitchie was in ill health and through fear for his life would not consent to the prosecution of any one and, after seeing Fitchie on the witness stand and listening to his testimony, we have not the slightest doubt as to the truth of Sumner's statement. Furthermore, there is other evidence of record to indicate that Sumner has zealously and persistently pursued the matter in spite of Fitchie's reluctance. The argument is also made that Sumner's testimony is not to be believed because he "has reached his dotage, and in later years has become obsessed with hallucinations by reason of the lawless commotion usually attendant in the affairs of labor organizations when accompanied by events through which he passed." To any one who saw Sumner and heard him testify no comment on such an argument would be necessary. Regardless of his years Sumner was mentally alert and physically vigorous and whatever may be said of his testimony in other respects there is no justification for the argument of petitioner's counsel just referred to. As for the witness who claimed to have solved the Fitchie kidnaping and found that petitioner was not the kidnaper, we may say there was nothing about him or his demeanor on the witness stand that would instill the slightest confidence in his testimony. And after listening to the testimony of various witnesses, particularly that of Fitchie, we are not in any way impressed with the argument that the kidnaping was or may have been faked or framed.

We agree with petitioner's counsel that the respondent's action as to this issue must stand or fall on the truth or falsity of Sumner's testimony, but in our opinion it must stand because we believe his story as to the identity of the recipient of the ransom money. We have listened carefully to the witnesses called by the petitioner in his attempt to discredit Sumner and cast doubt on his story and, while their testimony may tend to refute any claim of self-righteousness on the part of the Milk Wagon Drivers Union, its members, or Sumner, as to their labor activities and while we recognize in Sumner a man whose stories never lose any of their gloss by being retold, the substance and material details of his story of the kidnaping and the payment of the ransom money have never varied and we are convinced that his identification of petitioner as the man who took the $50,000 of ransom money from his automobile is correct.

Counsel for petitioner also argues on brief that, even if Sumner's testimony be accepted, the evidence does not establish how much, if

any, income petitioner received from this source. We think the evidence establishes that petitioner received the entire $50,000 and we think it constitutes income under section 22 (a) of the Revenue Act of 1928. It is true the record does not show whether he retained all of that amount or paid some of it to others who aided him in the crime, but under no circumstances would he be entitled to any deduction for amounts paid to others for their assistance in the venture. *Frank A. Maddas, supra.* On this issue the respondent is sustained.

In his income tax return for 1932 petitioner claimed a deduction of $2,526 described as "Business Auto Expense." In his determination of the deficiency the respondent disallowed this deduction, stating that it had not been substantiated. The evidence shows that this deduction represented petitioner's estimate of his automobile expenses during the year. As we have previously stated, we are unable to conclude from the evidence of record that the petitioner was engaged in any legitimate business. The respondent's disallowance of the deduction in question is accordingly sustained.

For the year 1930 the respondent has determined a 25 percent penalty against petitioner for failure to file his income tax return for that year within the time prescribed by statute. Sec. 291 of the Revenue Act of 1928. The return was not filed until April 5, 1932, and petitioner has made no attempt to show that the delinquent filing was due to "reasonable cause and not due to willful neglect." On such a state of facts the imposition of the penalty is mandatory and the respondent's determination is sustained.

The final issue in this proceeding is whether or not any part of the deficiencies herein is due to fraud with intent to evade tax. Fraud will not be presumed and the burden of proof is on the respondent.

The facts show that the petitioner, in 1934, entered his plea of guilty to all counts in an indictment charging him with willfully, knowingly, and feloniously attempting to defeat and evade a large part of his income taxes for the years 1930, 1931, and 1932 and he has served the prison sentence imposed on him therefor by the court. This fact, however, does not preclude the imposition of the fraud penalty here. *Helvering* v. *Mitchell,* 303 U. S. 391.

While it is true that petitioner filed returns and reported taxable income for each of the three years involved, the facts of record definitely show that he reported only a part thereof. We do not think he had any intention of making a full and accurate report of his income, but intended to report only so much as he thought was necessary to avoid suspicion and investigation. The record is replete with facts which show that the respondent has sustained his burden of establishing that petitioner's returns for all three years were false

and fraudulent. It would serve no useful purpose to again recite those facts here. It is our conclusion that the deficiencies herein are due to fraud with intent to evade tax, and the respondent's determination of the 50 percent penalties is sustained.

Reviewed by the Board.

*Decision will be entered under Rule 50.*