Michael F. HALLABRIN, Mildred Hallabrin, Clarence I. Steffey, Marjorie P. Steffey, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 15201.

United States Court of Appeals
Sixth Circuit.

Dec. 12, 1963.

John Kennedy Lynch, Cleveland, Ohio, for petitioners.

Arthur E. Strout, Atty., Dept. of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before MILLER and O'SULLIVAN, Circuit Judges, and TAYLOR, District Judge.

ROBERT L. TAYLOR, District Judge.

This is a petition to review income tax deficiencies determined by the Commissioner of Internal Revenue against petitioners Michael F. Hallabrin and wife, Mildred, and Clarence I. Steffey and wife, Marjorie. The wives signed the income tax returns and this is the reason they joined in the petition. Hallabrin's deficiencies grew out of a claimed understatement of income from his coin operated machine business for the years 1953 through 1957, disallowed wage deductions claimed for 1956, which amounted to about $4,382.10, income from a football gambling pool operated during the football seasons of 1955 through 1957, a small utility expense item claimed in the year 1955 and a small depreciation item on coin machines. The utility item amounted to approximately $826.67 and the depreciation item claimed for the year 1957 amounted to $2,687.74.

Steffey's deficiencies arose from his failure to report his alleged profits from the gambling pool during the football seasons from 1955 through 1957 which he allegedly operated in partnership with Hallabrin.

During the years at issue, Hallabrin operated a business known as M & H Novelty Company. He owned and operated coin operated machines, pin ball machines, shuffle alleys and music boxes. He and Purky made collections from the machines which were split with the owners of the locations.

The Commissioner determined that Hallabrin understated the gross receipts from his coin operated machine business by $13,166.30, $16,239.50, $15,000.00, $10,676.30 and $5,654.00 for the years 1953 through 1957.

He owned about 70 machines and operated at about 40 locations. His office was located at 116 North Main Street, Mansfield, Ohio. Also located at this place were Temple Billiards, a poolroom owned and operated by Hallabrin, the Main Athletic Club for the years 1955 and 1957 and the Italian American Club for the year 1956.

Steffey and wife owned all the stock in Central Ohio Vending Company, a corporation, which likewise engaged in the coin operated machine business. Hallabrin and Steffey used jointly a warehouse located at the rear of Temple Billiards for their coin operated businesses. Utility costs of the building were shared equally. Each received business calls at Temple Billiards.

Hallabrin claimed wage deductions as a business expense in his income tax return for 1956.

| | |
|---|---|
| Charles A. Gantz, | $ 625.60 |
| Kenneth Purky, | 7,676.00 |
| Robert E. Stewart, | 2,561.00 |
| Howard A. McQuillen, | 1,000.00 and |
| Everett K. Ellison | 195.50 |

Amounting in all to $12,058.10

He claimed that these men worked for his Novelty Company during that year.

He also claimed the following utility expenses for the years 1954 through 1957:

| | |
|---|---|
| 1954 | $ 126.21 |
| 1955 | 430.21 |
| 1956 | 1,226.67 |
| 1957 | 203.34 |

He adopted a three-year write off for the coin operated machines and claimed a depreciation deduction as follows:

| Date Acquired | Cost | Life | Depreciation |
|---|---|---|---|
| 1956 | $22,000 | 3 yr. | $ 7,000 |
| 1957 | 14,000 | 3 yr. | 4,633 |
| | | | $11,633 |

The entire cost of the machines was deducted in 1956 and the Commissioner determined that the depreciation claimed for 1957 should be disallowed to the extent of $2,687.74.

The Commissioner determined that Hallabrin and Steffey operated a football gambling pool during the years 1955, 1956 and 1957. In each of those years, the pool was operated nine or ten weeks. Pool cards were printed by Sliman at the instance of Paar, acting for Hallabrin. Paar was a gambler who sold spot cards. Handicap service for the football operation was purchased by Hallabrin and Steffey. Bets were placed from time to time with a gambler in Canton, Ohio. The cards were sold in Mansfield, Mount Vernon, Manor, Shelby, Ashland and Norwalk, Ohio. The bets varied from 25¢ to several dollars, the average being $1.00. Hallabrin and Steffey were each convicted in a federal court for failing to file wager excise tax returns for the operation of the football pool during September 1955, September 1956 and September 1957 in violation of Section 7203, I.R.C. 1954 on June 10, 1960.

Steffey and his wife filed a joint return for the years 1955, 1956 and 1957 and the Commissioner assessed deficiencies against them for failure to disclose income derived from Steffey's football pool operations. Neither books nor other records were maintained with respect to the football wagering pool.

Hallabrin's returns for the years 1954, 1955 and 1956 were filed after due date as shown below:

| Year | Date Due | Date Filed |
|---|---|---|
| 1954 | April 15, 1955 | February 14, 1957 |
| 1955 | April 15, 1956 | June 15, 1956 |
| 1956 | April 15, 1957 | May 20, 1957 |

The Commissioner assessed penalties against him as prescribed in 6651(a) and 6654, I.R.C. 1954 and 294(d) (1) (A) I.R.C. 1939.

All deficiencies and penalties assessed by the Commissioner were approved by the Tax Court.

Hallabrin contends that the Tax Court erred in holding (1) that he received receipts from his coin machine business in excess of those reported on his income tax returns filed and (2) that he received any income from a football pool operated in partnership with Steffey.

The following is a comparison of the income reported by Hallabrin with that determined by the Commissioner:

| Year | Commissioner's Determination | Reported Income |
|---|---|---|
| 1953 | $36,400.00 | None |
| 1954 | 52,000.00 | $35,760.50 |
| 1955 | 57,200.00 | 42,200.00 |
| 1956 | 54,600.00 | 43,923.70 |
| 1957 | 54,600.00 | 48,946.00 |

Steffey and Hallabrin's coin businesses were similar in size and scope. Each had in operation from 35 to 40 machines. They shared receipts with location operators upon a 50-50 basis. Much of the expense of operation was shared equally. Hallabrin did not take a personal salary deduction in reporting his net income for tax purposes. Steffey took some of his net profit in the form of a salary. His salary was a little more than $20,000.00 per year. The business incomes as re-

ported by Hallabrin and Steffey are as follows:

| Year | M & H Novelty Company Net Income as Reported | Steffey's Net Profit through Salary |
|------|------|------|
| 1953 | None | Not in Evidence |
| 1954 | $4,549.60 | " " " |
| 1955 | 1,408.18 | $24,774.78 |
| 1956 | 3,234.51 | 20,850.54 |
| 1957 | 9,771.45 | 20,300.00 |

The excess of Steffey's business income over Hallabrin's reported income and the understatement as determined by the Commissioner for the three years are compared as follows:

| Year | Excess of Steffey Income Over Hallabrin Reported Income | Understatement Determined by Commissioner |
|------|------|------|
| 1955 | $23,366.60 | $15,000.00 |
| 1956 | 17,616.03 | 10,767.30 |
| 1957 | 10,528.55 | 5,654.00 |

The increases found by the Commissioner do not bring Hallabrin's income from his coin machine business to the level of Steffey's.

Kenneth E. Purky, the one who, along with Hallabrin, made the collections, told the Internal Revenue agents that the gross receipts from the business averaged about $1,000.00 per week during 1957. Hallabrin testified that some weeks the machines would produce $1,000.00, other weeks $500.00 or $600.00. He stated that the gross receipts from the football pool in 1955 were between $12,000.00 and $14,000.00 and he told the Internal Revenue agents that the receipts amounted to about $15,000.00 a year. Hallabrin and Steffey both stated that the gross receipts from the football pool were about the same for the years 1955, 1956 and 1957.

■ Failure of the taxpayer to keep books and records of his business operation gives the Commissioner the right to use the best evidence available to determine income. *Fuller v. Commissioner of Internal Revenue*, 313 F.2d 73 (C.A. 6); *Rubino v. Commissioner of Internal Revenue*, 226 F.2d 291, 295 (C.A. 6);

*Wexler v. Commissioner of Internal Revenue*, 241 F.2d 304, 305 (C.A. 6).

■ There are contradictions and inconsistencies in the testimony of Hallabrin pertaining to material matters and the Tax Court did not err in refusing to believe him. *Head v. Hargrave*, 105 U.S. 45, 26 L.Ed. 1028; *The Conqueror*, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937; *Uncasville Mfg. Co. v. Commissioner of Internal Revenue*, 55 F.2d 893, 897 (C.A. 2).

■ The weight of the testimony is to be determined by the trier of fact. *Quock Ting v. United States*, 140 U.S. 417, 11 S.Ct. 733, 35 L.Ed. 501; *Tracy v. Commissioner of Internal Revenue*, 53 F.2d 575, 578 (C.A. 6).

The weekly reports compiled by Purky covered only three months of 1953 and only six months of 1954. No other weekly report was presented covering any other portion of the taxable years involved although Purky stated that he prepared them each year. No records were available for the year 1955 although Balyeat, a public accountant who prepared the returns for Hallabrin, stated that he turned some records over to the Internal Revenue agents who investigated the case. As to the 1956 and 1957 records, the Tax Court stated:

"The remaining records constituted columnar listings of weekly collections and expenses for 1956 and 1957 which were purportedly taken from the yellow carbon slips. They were allegedly prepared by Hallabrin and a friend and their credibility rests entirely on the testimony of Hallabrin. We have carefully considered Hallabrin's testimony and based on the whole record we conclude that it is not worthy of belief.

"The testimony of the accountant who prepared certain work sheets and the returns for the years in question adds little. He had no first hand knowledge of the accuracy of the figures but worked from unverified figures supplied by Hallabrin."

When the collections were made from the machines by Purky, he prepared a white slip with a duplicate yellow copy showing the amount collected from each location owner. He turned the white slip over to the location owner and kept the yellow duplicate for Hallabrin. The yellow slips were placed in Hallabrin's safe. None of them were presented by the taxpayer to verify his statement of income. The years 1953 through 1957 covered 260 weeks. Hence, 260 weekly reports should have been filed. Only 34 are in evidence. Some of the reports for the early years of 1953 and 1954 have survived. No effort was made to substantiate the claimed collections by reference to the white collection slips that were left with the location owners.

Balyeat's testimony adds little strength to the petitioner's claim. No record of receipts for M & H Novelty Company was given Balyeat to use in preparing the 1956 return. Hallabrin phoned him on April 15, 1957 and gave him a figure of $43,923.70 as the total receipts for the year 1956. No reports were produced for 1957. Balyeat stated that he had the weekly summary sheets when he prepared the return for 1957, but Hallabrin testified that he gave him only a yearly summary list.

█ Although the evidence is thin, we conclude that it was sufficient to establish a reasonable basis for the determination by the Commissioner that Hallabrin understated the receipts from his coin operated machine business for the years 1953 through 1957. The Commissioner, as is usual in a case of this character, relied upon the presumption of the correctness of his determination and failed to state the methods used by him in reaching his conclusions. This has made the decision of the Court more difficult.

## WAGE DEDUCTIONS

The Commissioner allowed only Purky's salary of $7,676.00 as a wage deduction for the year 1956. The evidence indicates that Gantz, Stewart and Ellison worked for Temple Billiards or the Italian American Club during 1956. Steffey testified that McQuillen worked for the Club. Hallabrin stated that Stewart, Ellison and Gantz worked for him at Temple Billiards. Hallabrin also stated that McQuillen did not work for him during 1956 and that Gantz may have. Balyeat testified that he knew that McQuillen worked for Hallabrin.

None of these wage earners testified except Purky.

Hallabrin contends that wage deductions should be allowed if the individuals worked for Temple Billiards as this was a trade name used by him. The deduction was claimed by M & H Novelty Company as an expense when no return was filed for Temple Billiards. Hallabrin reported Temple Billiards in 1955 and showed a gross income of $8,862.86 and a net income of $2,922.61. He failed to report Temple Billiards' income for 1956.

Respondent contends that the deductions should not be allowed as expenses of Temple Billiards when the taxpayer failed to show that they were proper deductions for M & H Novelty Company for whom they were claimed.

█ The preponderance of the proof shows that the men, except Purky, did not work for M & H Novelty Company during the year 1956 but worked for Temple Billiards during that year and that the income of Temple Billiards was not reported. We are of the opinion that the Commissioner was justified in disallowing these wage deductions for the year 1956.

## UTILITY DEDUCTIONS

The Commissioner reduced the utility expense for the year 1956 to $400.00. Taxpayer claimed the sum of $1,226.67 as a deductible utility expense for that year. The proof shows that the utility expense for 1954 was $126.21, for 1955 $430.21 and for 1957 $203.34. It is to be observed that the utility expense claimed for 1956 far exceeds the utility expense claimed for any other year. Taxpayer does not complain in his brief of the action of the Commissioner in disallowing this item which was approved by the

Tax Court and we concur in the action of the Tax Court in its approval.

## DEPRECIATION

Hallabrin in 1957 adopted a three-year depreciation basis for his coin operated machines. In prior years he had deducted the cost of the machines in the year purchased as cost of goods sold. Such a procedure was employed in 1956. In 1957 he began a three-year write off for the machines and deducted one-third of the cost of the machines purchased in 1956 even though the entire cost of the machines had been deducted in 1956 as cost of goods sold. Hence, the depreciation method used in 1957 gave him a second deduction for the machines purchased in 1956. The Commissioner determined that the depreciation claimed for 1957 should be disallowed to the extent of $2,687.74. Taxpayer does not complain in his brief of the action of the Commissioner with respect to this item. The Tax Court approved. We agree with the Commissioner and the Tax Court.

## FOOTBALL WAGERING POOL

█ Another question for determination is whether Hallabrin and Steffey operated a football wagering pool during the football seasons of 1955 through 1957 and if so, did they realize a profit from such operation. The Commissioner determined that taxpayers operated as partners a football wagering pool during these years and realized substantial profits therefrom. The Commissioner increased the income of Hallabrin in the sum of $10,450.00 in 1955, $10,975.00 in 1956 and $11,025.00 in 1957 on the theory that these increases represented Hallabrin's share of profits from a football pool operation. Steffey's share of the profits as determined by the Commissioner was the same as that of Hallabrin for those years.

Petitioners contend that there is no evidence to support the determinations of the Commissioner. Petitioners entered pleas of guilty to a federal indictment charging them with operating a football wagering pool during those years. Petitioners stated to the Internal Revenue agents that they were the operators of the football wagering pool. In their testimony, they claimed that they were only the agents of Main Athletic Club or the Italian American Club. The Tax Court did not believe them. We are of the opinion that the evidence supports the holding of the Tax Court.

As to whether or not there is evidence to support the determination of the Commissioner, and the holding of the Tax Court, that petitioners operated the football pool during the years in question at a substantial profit is a more difficult question. The Tax Court had this to say on the question:

"Having found that Hallabrin and Steffey did operate the football pool we are confronted with the question of whether the Commissioner's determination of the amount of income derived from such football pool operation is fair and reasonable.

"Petitioners claim that the football pool operation resulted in a loss. Hallabrin testified that he had to borrow money to pay the 'hits.' Similarly, Steffey stated that he lent money to the pool to meet its obligations. There is evidence that Hallabrin did borrow money, but we are unable to find any connection between such borrowings and the football pool operation. Petitioners subscribed to a handicap service from which the football cards were prepared. And even though they were supposedly losing money they continued the operation for three years. Suffice to say, we are not convinced that the football pool was a losing operation.

"The dearth of the findings with respect to the football pool operation emanates from the unsatisfactory testimony relating to the venture and the petitioners' failure to maintain books. In Schira v. Commissioner, 240 F.2d 672, 673 (C.A. 6, 1957), affirming a Memorandum Opinion of this Court, the court said that: 'In the absence of books and records the Commissioner was jus-

tified in making assessments based upon other available evidence, provided they were not arbitrary or unreasonable.'

"As shown in our findings, 5,000 'no spot' cards were printed each week plus an undetermined number of 'spot' cards. Although the testimony concerning the amount bet varied greatly it would seem that a reasonable average would be one dollar a card. Accordingly, a reasonable gross over a nine or ten-week season would seem to be between $60,000 and $80,000, taking into consideration that all 5,000 no spot tickets might not have been sold but that an undetermined number of spot cards had been sold. The Commissioner's determination that the net after expenses, commissions and 'hits' were paid was approximately $20,000 which was then split between petitioners is not, in our opinion, so questionable as to warrant disapproval. Cf. Helvering v. Taylor, supra. [293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623]. The burden was on petitioners to show the error in the Commissioner's determination. If that burden was difficult to meet it was a situation that they themselves created by reason of their failure to keep adequate records. Anthony Delsanter, supra [28 T.C. 845]."

Hallabrin told the Internal Revenue agents that the gross take on football wagers in 1955 was about $15,000.00 and about the same for the years 1956 and 1957. Steffey told the Internal Revenue agents that the gross receipts from the football wagering operation for the year 1955 was around $8,000.00 or $9,000.00 and about the same for the years 1956 and 1957. He stated that he had about 1,500 slips printed (It is not clear whether he meant 1,500 per week) and that he and Hallabrin were to split the net profits on a 50-50 basis. He and Hallabrin testified that the pool did not make a profit. The minimum bet was 50¢ to $1.00.

Samuel T. Sliman was approached by Fred Paar to print no spot tickets for the Italian American Club in 1957. Sliman printed 5,000 tickets supposedly for the Club in 1957, but according to the testimony of Paar they were printed for Hallabrin.

John Dragomir, Jr. placed some football pool bets with Hallabrin at Temple Billiards. He collected his winnings from Hallabrin, which he estimated to be between $5,000.00 and $8,500.00.

Glen Bethea distributed football pool tickets for the years 1955, 1956 and 1957 "for the Club, through Mr. Hallabrin." Hallabrin arranged for the distribution in the presence of Steffey. He was supposed to get 50% of the profits at the end of the season. Instructions were given by Hallabrin. He picked up 100 or more tickets each week. He estimated he sold 1500 to 1800 tickets per season. He never received any of his commissions.

Bruno Mollica sold football tickets for Hallabrin during the years 1955, 1956 and 1957. He turned the sales in at the Italian American Club. Zeve Brody and Hallabrin contacted him to pick up the tickets. (Zeve Markove was the manager of the Club, but he was called Brody.) He was to receive 25¢ on the dollar from the sales. When he made the sales he would put the stubs and the money in an envelope and take the envelope to the counter of the Club and turn it over to the one located at the counter. Sometimes Hallabrin and Brody would pick up the tickets. He only sold $25.00 of tickets each week. He had one customer who would buy a $10.00 or $20.00 ticket. The smallest bet was $1.00 and the largest one was $20.00. In 1955, he worked in a group of four and the four would average $100.00 of sales a week, or $25.00 each. Sales were about the same for 1956 and 1957. Hallabrin told him to keep the money down.

Petroff sold tickets for Hallabrin in 1955, 1956 and 1957. The average play in 1955 on the tickets that he sold was about $80.00 to $100.00 a week. The sales averaged about the same in 1956

and 1957. He obtained the tickets from Hallabrin. He handled 25¢, 50¢, $1.00, $2.00, $3.00 and $5.00 tickets. Some would buy 25¢ tickets and others $5.00 tickets. He put the stubs and the money from the sale of the tickets in an envelope or a cigar box and the cigar box would be picked up by Hallabrin or Bishop. Hallabrin or Bishop would bring the money to pay off the hits.

The fact that petitioners operated the pool for three years indicates that they made money. There is evidence that 5,000 no spot tickets were printed each week in 1955 and about the same number during the other two years. The testimony indicates that the tickets averaged about $1.00. Bethea picked up about 100 tickets a week and the bets on those tickets amounted to $1,500.00 to $1,800.00 a season. This would indicate that the sales he made averaged in excess of $1.00 each.

It is a reasonable assumption that the average bet was at least $1.00 and that petitioners grossed from $20,000.00 to $30,000.00 more than the testimony of Hallabrin indicated they grossed and from $35,000 to $40,000.00 more than the testimony of Steffey indicated that they grossed. They testified that the operation just about broke even or lost a little money on gross annual receipts of $8,-000.00, $9,000.00 or $15,000.00. The added extra gross less commissions would leave some $20,000.00 to $35,000.00 profit to be split upon a 50-50 basis between the petitioners. The amount determined by the Commissioner averaged a little more than $20,000.00 net.

■ These assessments made by the Commissioner were "necessarily largely in the nature of estimates." They were reasonable estimates. They were presumptively correct and the burden rested upon the taxpayers to prove them erroneous. Doll v. Glenn, 231 F.2d 186, 188 (C.A.6).

■ It is the function of the Tax Court to draw inferences from the facts and to choose between conflicting inferences. An inference of fact drawn by that court is not to be overturned if it is reasonable and has substantial support in the evidence. Helvering v. National Grocery Co., 304 U.S. 282, 294, 58 S.Ct. 932, 82 L.Ed. 1346; Wichita Terminal Elevator Co. v. Commissioner of Internal Revenue, 162 F.2d 513, 515 (C.A.10); Commissioner of Internal Revenue v. Flowers, 326 U.S. 465, 66 S.Ct. 250, 90 L.Ed. 203.

We conclude that the determinations by the Commissioner, which have the approval of the Tax Court, are reasonable and supported by the evidence.

The judgment of the Tax Court is affirmed.