LILLIAN PASCARELLI, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

LILLIAN PASCARELLI, TRANSFEREE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4587–66, 3596–68. Filed March 25, 1971.

*Paul Wolfe*, for the petitioner.
*Alan M. Stark*, for the respondent.

SIMPSON, *Judge:* In docket No. 4587–66, the respondent determined the following deficiencies in and additions to the Federal income tax of the petitioner:

| Year | Deficiency | Penalty, sec. 6653(b) [1] | Addition, sec. 6654 |
|------|-----------|----------------------|---------------------|
| 1959 | $14,914.11 | $7,457.06 | $412.06 |
| 1960 | 27,009.58 | 13,504.79 | 405.04 |
| 1961 | 14,966.70 | 7,483.35 | |
| 1962 | 8,904.07 | 4,452.03 | |
| 1963 | 14,371.21 | 7,185.61 | 395.14 |

[1] All statutory references are to the Internal Revenue Code of 1954.

In docket No. 3596–68, the respondent determined the following deficiencies in and additions to the Federal gift tax of Anthony DeAngelis, and asserted that the petitioner was liable for such amounts as transferee of Mr. DeAngelis' assets:

| Year | Deficiency | Addition, sec. 6651(a) |
|------|-----------|------------------------|
| 1959 | $ 3,360.90 | $ 840.22 |
| 1960 | 16,101.58 | 4,025.39 |
| 1961 | 9,067.50 | 2,266.87 |
| 1962 | 6,671.25 | 1,667.81 |
| 1963 [2] | 10,687.50 | 2,671.87 |

The original deficiencies were based in part upon the theory that certain transfers made by Mr. DeAngelis in 1959 to a brokerage account in the petitioner's name were initially loans but became compensation or gifts in 1960. However, the respondent later amended his answers in both dockets to provide that, in the event that we do not find the transfers originated as loans in 1959, then we should determine that they constituted compensation or gifts to the petitioner at the time the transfers were made. In docket No. 4587–66, the amended answer claimed an additional deficiency in income tax for 1959 of $21,606.94, and additional penalties for that year of $10,803.47 under section 6653(b) and $604.99 under section 6654. In docket No. 3596–68, the amended answer claimed an additional deficiency in gift tax for 1959 of $5,997.44, and an additional penalty for that year of $1,499.37 under section 6651(a).

The two notices of deficiency represent alternative theories of the respondent with respect to the same funds, and the two proceedings were consolidated at trial. The primary issue for decision is whether certain funds which are stipulated to have been transferred by Anthony DeAngelis to the petitioner during the years 1959–63 were compensation for services rendered or gifts, or whether the petitioner merely acted as the agent of Mr. DeAngelis in holding such funds to be spent for his purposes and at his direction. In addition, we must decide whether the petitioner received certain funds which Mr. DeAngelis transferred into a brokerage account in her name and other funds which he expended for improvements made to the petitioner's realty, and if so, whether those amounts were compensation or gifts. The respondent conceded on brief that the petitioner is not liable for any of the fraud penalties assessed under section 6653(b) in docket No. 4587–66.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found. The petitioner, Lillian Pascarelli, is an individual who maintained

---

2 The deficiency notice repeated the figure "1962" when referring to the 1963 figures, but the statement which followed made clear that the reference should have been to 1963.

her legal residence in Tenafly, N.J., when the petitions were filed in this case. For the taxable years 1960, 1961, 1962, and 1963, she filed her Federal income tax returns with the district director of internal revenue, Newark, N.J. She did not file a Federal income tax return for 1959. Anthony DeAngelis filed no Federal gift tax returns for the years 1959 through 1963.

The petitioner was born in 1920. She was first married in 1937, and such marriage ended in divorce in 1940 or 1941. She was married a second time in 1942 or 1943; this marriage ended in divorce in June 1959. Each marriage produced two children. The petitioner has been unmarried since the 1959 divorce.

Anthony DeAngelis was born in 1915. He was married in 1938, and such marriage was never terminated. However, he has been separated from his wife since about 1954.

The petitioner met Mr. DeAngelis in 1940 or 1941, at which time she was separated from her first husband. Their close personal relationship began shortly thereafter. In 1941, Mr. DeAngelis lived for a time in the same house with the petitioner and her mother. At that time, the petitioner's mother loaned Mr. DeAngelis between $2,000 and $3,000 that he needed to go into business, and expressed the hope that he "look after" the petitioner in the future. Through all the years of their acquaintance, Mr. DeAngelis made payments to the petitioner in indeterminate amounts, including $5,700 in 1955; however, such payments were not comparable in amount to the payments made during the years 1959 through 1963. The pre-1959 payments were made to assist the petitioner and her children and were made without restriction as to usage.

Mr. DeAngelis was the principal officer of, and the primary "salesman" for, a corporation, referred to as Allied, during the years 1959 through 1963. Such corporation was engaged primarily in the fats and oils business. Allied did millions of dollars worth of business, dealing with foreign companies in diverse parts of the world as well as large domestic corporations. Allied also owned or controlled plants or refineries in New Jersey, Pennsylavnia, North Carolina, Louisiana, Illinois, and Ohio. In October 1963, a petition in bankruptcy was filed with respect to Allied. In January 1964, a petition in bankruptcy was filed against Mr. DeAngelis personally, and he was soon thereafter adjudged bankrupt.

Mr. DeAngelis was convicted in 1965 of interstate transportation of forged documents. He was sentenced to 20 years in jail, and at the time of trial was still serving that sentence at the Federal Penitentiary in Lewisburg, Pa.

In October 1959, the petitioner purchased a house at 63 Berkley Drive, Tenafly, N.J. The full purchase price of the house was $65,000;

a downpayment of $40,000 was made. The title to the property was in her name alone; Mr. DeAngelis had no ownership interest in it. From about the time of such purchase through the period here in issue, the house was occupied by the petitioner and Mr. DeAngelis, along with two or three of the petitioner's children. The petitioner's sister, brother-in-law, and young niece also lived there for some period of time during those years. The house had a main floor and a lower floor or basement. The petitioner and her children slept on the main floor, and Mr. DeAngelis occupied the lower floor, which was modified to include a four-room "apartment." In all other respects, Mr. DeAngelis and the petitioner had a relationship akin to that of a husband and wife, with the petitioner in the role of a housewife. She did his washing and cleaning, bought clothing for him, and performed other wifely duties. One important reason for Mr. DeAngelis' sleeping in a separate portion of the house was the presence of the petitioner's teenage children.

The petitioner and Mr. DeAngelis often traveled together, and when they were staying at any place except in the petitioner's home in Tenafly, they stayed as man and wife. In fact, such trips together took place prior to the petitioner's purchase of the house, including a 3-month trip to Spain in 1959. Mr. DeAngelis maintained his principal residence in the petitioner's house in Tenafly until the time he was sent to prison.

Many of the trips on which the petitioner accompanied Mr. De-Angelis during the period with which we are concerned were taken for the purpose of pursuing his business interests. Between the time that they started living together in the petitioner's house in Tenafly and the time of Mr. DeAngelis' business collapse, the house was often used to entertain people who had business relationships with Mr. DeAngelis. The petitioner assisted in such entertainment, both in her home and on the trips away from home.

In 1959, Mr. DeAngelis transferred $41,228.94 directly to the petitioner by means of six checks. In 1960, he transferred $32,500 directly to her by means of 12 checks; he also transferred $2,785 to her through a third party, for a total in 1960 of $35,285. In 1961, he transferred $43,300 directly to her by means of 21 checks. In 1962, he transferred $32,250 directly to her by means of 20 checks; he also transferred $400 to her through a third party, for a total in 1962 of $32,650. In 1963, he transferred $62,800 directly to her by means of 37 checks; he also transferred $1,200 to her through a third party, for a total in 1963 of $64,000. However, in 1963, the petitioner returned $14,000 to Mr. DeAngelis.

In 1959, a brokerage account was opened in the petitioner's name with D. R. Comenzo & Co. (Comenzo), a brokerage house. The purpose

of the account was to trade in the commodity market. The account was opened with $2,000 which the petitioner contributed. In 1959, Mr. DeAngelis subsequently transferred sums totaling $32,406 into that account. Such transfers were not made as loans to the petitioner. Mr. DeAngelis managed all of the buying and selling activities with respect to such account pursuant to a power of attorney executed by the petitioner; she was not knowledgeable in such matters and did not direct the purchases and sales herself. The petitioner received monthly statements on the status of the account from Comenzo, and she looked at the statements but did not understand their significance. On at least one occasion, in 1963, she endorsed a check from Comenzo in the amount of $1,692. Another check, in the amount of $15,674.50, was paid out of the Comenzo account on October 20, 1960. The petitioner was the payee of such check; on October 21, 1960, she made a deposit of $15,674.50 to her checking account. Another check to the petitioner, in the amount of $5,500, was paid out of the account on April 18, 1961.

The petitioner reported gains from the Comenzo account on her individual Federal income tax returns as follows: 1960, $32,730; 1961, $3,818.50; 1962, $1,500; 1963, $1,692. In an interview with Carmine M. Discenza, a special agent with the respondent's intelligence division, on August 18, 1964, the petitioner stated that the Comenzo account was entirely hers to the best of her recollection, that there were no "partners" in it, that she received all of the proceeds of such account, that she did not divide the proceeds in any way between herself and Mr. DeAngelis, and that she could not recall whether or not Mr. DeAngelis had prompted her initially to open the account. At a hearing before a referee in bankruptcy in the U.S. District Court for the district of New Jersey, in the matter of Mr. DeAngelis' bankruptcy, the petitioner testified under oath on April 6, 1964, that she had received all the profits from the Comenzo account, and that she used such funds for her living expenses. In an interview with Matthew Cairone, a special agent with the respondent's intelligence division, on April 6, 1965, Mr. DeAngelis stated that the Comenzo account belonged solely to the petitioner, that she alone received the profits therefrom, and that he handled the trading for her but did not have a financial interest in the account. We find that the money in the Comenzo account did in fact belong to the petitioner, and that the sum of $32,406 which Mr. DeAngelis transferred into that account in 1959 constituted a gift to the petitioner in that year.

In 1960, Mr. DeAngelis paid $10,800 directly to John Bellochhio, trading as the Glenn Contracting Co., for landscaping work performed on the petitioner's property at 63 Berkley Drive. In the same year, Mr. DeAngelis paid $3,780 directly to Robert Smith for work performed in making improvements to the basement at the same address. The improvements to the basement were done according to

Mr. DeAngelis' specifications, as that part of the house served as his living quarters.

The petitioner bought a new Cadillac for herself in 1961, paying approximately $5,526 for it with her check. That Cadillac was traded on another new Cadillac in 1962, with a cash difference of $2,700, which was also paid by the petitioner's check. The cars were used occasionally to pick up Mr. DeAngelis at his place of business in Bayonne, N.J., and drive him home, but the petitioner also used them for her personal errands such as shopping and transporting her children. The petitioner does not know how many miles these cars were driven during the years in issue, and does not know how many miles they were driven for the purpose of picking up Mr. DeAngelis at work. Mr. DeAngelis sometimes used a company car, to which he had access any time he wanted it.

In addition, the petitioner purchased a Buick automobile for her daughter, Christine, in 1961, and paid for it out of funds that Mr. DeAngelis had transferred to her. The purchase price of the Buick was approximately $3,500.

The petitioner transferred by check to her sister, Sarah DeFalco, $2,000 in 1961, $200 in 1962, and $60 in 1963; to her sister, Mary Paul, $750, in 1960, and $1,800 in 1963; to her son-in-law, John Fontana, $100 in 1962, $2,700 in 1962 or 1963, and $4,000 in 1963; to her son, Richard Ferrari, $400 in 1960; to her daughter-in-law, Antoinette Ferrari, $200 in 1962 and $260 in 1963; and to her brother-in-law, Jerry Pascarelli, $100 in 1961. Also during the years in issue, she made deposits in certain bank accounts which were in her name, in trust for certain of her children. The balance of one such account in the petitioner's name in trust for her son, John J. Pascarelli, was increased by a deposit of $5,000 from Mr. DeAngelis' money in 1959. Another account, in the petitioner's name in trust for her daughter, Christine Pascarelli, was opened in June 1961, and had a balance of $9,900 by September of the same year.

The petitioner used $8,000 of the funds that Mr. DeAngelis transferred to her to make a loan to Henry Anderson, in order to enable him and his wife to purchase a home. The loan was motivated by the petitioner's personal friendship with the Andersons.

The petitioner sometimes purchased items of clothing for Mr. DeAngelis. Such items included shoes, socks, shirts, ties, and topcoats. We find that the petitioner spent $350 per year during the years 1960, 1961, 1962, and 1963 on articles of clothing for Mr. DeAngelis.

The petitioner entertained and purchased gifts for people with whom Mr. DeAngelis had business dealings. Such entertainment was conducted, and such gifts were purchased, at Mr. DeAngelis' request and with his authorization. The entertainment included parties at the petitioner's home to which a number of Mr. DeAngelis' business asso-

ciates and their wives were invited; also, the petitioner sometimes took the associates' wives out to dinner, to the theatre, and on shopping trips, in New York City, in Florida, and in other places. Generally, the beneficiaries of the entertainment were not the petitioner's personal friends, and the petitioner paid for most of such entertainment out of the funds transferred to her by Mr. DeAngelis. We find that the petitioner expended a total of $1,500 in 1959 and $5,000 per year in 1960, 1961, 1962, and 1963 for entertainment on Mr. DeAngelis' behalf and at his request. Furthermore, the petitioner bought and paid for certain gifts for people associated with Mr. DeAngelis in business, primarily the wives of such associates. The recipients of these gifts were not the petitioner's personal friends. We find that the petitioner spent a total of $1,000 per year in 1959, 1960, 1961, 1962, and 1963 for such gifts.

The petitioner received payments from the Louant Trading Corp. (Louant) of Bayonne, N.J., in amounts aggregating $4,800 in 1960, $5,200 in 1961, $5,200 in 1962, and $500 in 1963. All such payments were reported as income on the petitioner's individual Federal income tax returns for those years. The petitioner never performed services for Louant; she received the payments only because Mr. DeAngelis arranged for them to be made to her. He effected such arrangement by agreeing to render valuable business assistance to the man who ran Louant in return for the latter's payments to the petitioner; when Mr. DeAngelis' business assistance ended, so did the payments from Louant to the petitioner. However, in a hearing in the matter of Mr. DeAngelis' bankruptcy in the U.S. District Court for the District of New Jersey, the petitioner testified under oath that she received the money from Louant in return for services that she performed as a "social hostess" for that corporation. She testified that she performed such services on about 10 or 12 occasions during each year, and that Mr. DeAngelis had nothing to do with her "employment" by Louant. Also, she stated to a special agent of the respondent in an interview in August 1964 that she received the payments from Louant for entertaining that corporation's customers and that the payments terminated in 1963 because she no longer wanted to render such services.

The petitioner kept no records of any kind. More specifically, she kept no records of how much money Mr. DeAngelis gave her, of how much she spent on his behalf, of how much she returned to him, of how much he gave her to run the household, of whom she entertained, of how much such entertainment cost, of the extent to which her house was used for Mr. DeAngelis' business purposes, of how many miles she drove her automobiles, of how many miles were put on such automobiles for Mr. DeAngelis' purposes, or of what gifts she purchased for Mr. DeAngelis' business associates and how much such gifts cost.

The petitioner and Mr. DeAngelis had a very close personal relationship, and the services that she performed with respect to entertainment of his business associates were done in a spirit of cooperation similar to that which might prompt a wife to perform such duties to aid her husband in his business pursuits, and not for the purpose of obtaining compensation. She was not an employee of Mr. DeAngelis at any time during the years in issue. She did testify at the hearing with respect to Mr. DeAngelis' bankruptcy that she worked for Mr. DeAngelis and that the money he transferred to her was compensation for services; however, she knew such testimony to be false at the time she gave it. Mr. DeAngelis' dominant reasons for transferring the funds to the petitioner and for transferring the funds to the Comenzo account in her name were love and affection and disinterested generosity, except for the funds which she spent at his direction and on his behalf. Similarly, the amounts spent for improvements to the petitioner's realty were received by her as the sole owner of such realty and were not compensation.

### OPINION

Most of the amounts in dispute were stipulated to have been transferred by Mr. DeAngelis to the petitioner during the years in issue, and we must decide whether such funds were transferred as compensation for services rendered or as gifts, or whether the petitioner merely acted as the agent of Mr. DeAngelis in holding some or all of such funds to be spent for his purposes and at his direction. In addition, we must decide whether funds transferred by Mr. DeAngelis into the Comenzo account in 1959 constituted either compensation or gifts to the petitioner in either 1959 or 1960, and whether amounts paid by Mr. DeAngelis directly to contractors in 1960 for improvements to real estate owned by the petitioner constituted either compensation or gifts to the petitioner.

Because it is of substantial importance in this case, we point out, at the outset, that the petitioner has the burden of proving the respondent's determination wrong. Rule 32, Tax Court Rules of Practice; *Welch* v. *Helvering*, 290 U.S. 111 (1933).

We will deal first with the sums of money which were stipulated to have been transferred by Mr. DeAngelis to the petitioner. Such sums, which include money transferred through third parties, total $41,228.94 in 1959, $35,285 in 1960, $43,300 in 1961, $32,650 in 1962, and a net amount of $50,000 in 1963.[3] We must determine whether such trans-

---

[3] The amount of gift tax assessed by the respondent against the petitioner as transferee for 1963 in docket No. 3596–68 was based upon net transfers in that year in the amount of $50,500. Of that total, $500 represented income received by the petitioner from Louant in 1963, which the respondent alleged to be a gift made to the petitioner by Mr. DeAngelis. However, the petitioner's income tax return for 1963 reported such amount as income, and the respondent conceded on brief that the alleged net amount of gifts for 1963 should be reduced by $500. We adopt this concession.

ferred funds were payments of compensation or gifts, to the extent that the petitioner received dominion and control over such funds, and was not required to expend them for Mr. DeAngelis' purposes pursuant to his direction.

For Federal tax purposes, a gift must proceed from a disinterested and detached generosity, motivated by affection, respect, admiration, charity, or the like, with the most critical factor being the transferor's dominant intention. *Duberstein* v. *Commissioner*, 363 U.S. 278 (1960); *DeJong* v. *Commissioner*, 309 F. 2d 373, 379 (C.A. 9, 1962), affirming 36 T.C. 896 (1961); *Paul V. Hornung*, 47 T.C. 428, 438 (1967); *Max Kralstein*, 38 T.C. 810, 817 (1962). However, when a transfer is made without being motivated by a sense of generosity, but rather with the expectation of an economic benefit flowing to the transferor as a result, then no gift has been made, and the transferee realizes ordinary income to the extent of the excess of the value of what is transferred over the value of the consideration which is returned to the transferor. *Hamberg* v. *Commissioner*, 400 F. 2d 435 (C.A. 9, 1968), affirming a Memorandum Opinion of this Court. The mere absence of a legal or moral obligation to make a payment does not establish that such payment is a gift for tax purposes; in fact, such payment is not a gift if made in return for services rendered, or if made because of the incentive of anticipated economic benefit to the payor.

The motivation of Mr. DeAngelis, as transferor, must be determined from an analysis of all the evidence before us pertaining to the relationship between him and the petitioner. The petitioner and Mr. DeAngelis had a close personal relationship dating back nearly 20 years prior to the beginning of the period in issue. The relationship between them may have been influenced by Mr. DeAngelis' gratitude toward the petitioner's mother who assisted him in going into business. Although the petitioner was married to another man for 16 or 17 years in the interim, her relationship with Mr. DeAngelis continued in some form, and he established during that period a pattern of generosity toward her; his payments to her prior to 1959 carried no limitations with respect to the purposes for which they could be used.

During the years in issue, Mr. DeAngelis and the petitioner lived as husband and wife in all respects, except for the facts that they were not legally married and did not occupy the same bedroom at the petitioner's house in Tenafly because of their sensibilities with respect to the feelings of her children, who also lived there. The record indicates that they hope to continue their relationship in the future, and get married someday. Mr. DeAngelis' testimony throughout this case was marked by an attitude of protectiveness toward the petitioner, and a desire not to see her hurt financially by the complex web of circumstances woven by his financial dealings. Although we reject much of

the substantive testimony given by Mr. DeAngelis with respect to the financial circumstances of their arrangement, as will be discussed later, we do believe that Mr. DeAngelis' dominant interest in the petitioner is personal, and that their relationship was not one of employer-employee during the years in issue.

These circumstances led us to find that the petitioner did not perform services for Mr. DeAngelis for the purpose of obtaining compensation, but rather with the same spirit of cooperation that would motivate a wife to strive to help her husband advance in his business. Although it is true, as the respondent contends, that the petitioner's acting as "hostess" to Mr. DeAngelis' business associates and their wives was very valuable to his business, we think it would be artificial and incorrect to conclude that such acts were primarily motivated by a desire to be paid, much as an employee works to receive a salary. Similarly, it would be equally incorrect to conclude that Mr. DeAngelis made payments to the petitioner in order to compensate her for her help in his business. Based on the entire record, we conclude that such payments proceeded from disinterested and detached generosity on the part of Mr. DeAngelis toward the petitioner, and that they were motivated by sentiments of affection, respect, and admiration, all of which were credibly displayed in Mr. DeAngelis' testimony.

The next question is, to what extent were the funds which were undisputedly transferred by Mr. DeAngelis to the petitioner expended by her for Mr. DeAngelis' purposes pursuant to his direction, so that such funds were never really within the control of the petitioner? To the extent that the petitioner has shown that the funds were so expended, they cannot be considered as gifts for tax purposes, as a gift is not complete when the transferor retains dominion over the transferred property, and controls what is to be done with it. *Burnet* v. *Guggenheim*, 288 U.S. 280, 286 (1933); *Union Trust Co.* v. *United States*, 54 F. 2d 152, 155 (Ct. Cl. 1931), certiorari denied 286 U.S. 547 (1932); *Estate of Robert W. Hite, Sr.*, 49 T.C. 580, 594 (1968). To that extent, the petitioner acted merely as a conduit through whom the funds passed, and not as the beneficial owner or recipient of such funds.

In the first place, it is altogether clear that not all funds transferred to the petitioner by Mr. DeAngelis were to be spent for his purposes. She spent substantial amounts for her own benefit, for the benefit of her family, and for her friends. The two new Cadillacs which she bought for herself in 1961 and 1962 cost about $8,226, and the new Buick that she bought for her daughter in 1961 cost about $3,500. She transferred by check to her relatives a total of $12,570 between 1960 and 1963; also, bank accounts in her name in trust for two of her

children showed increments of at least $14,990 during the years in issue.

The petitioner used $8,000 of the funds transferred to her by Mr. DeAngelis to make a loan to the Andersons, a couple whom she described as friends of hers. The record does not indicate whether such loan was ever repaid. The petitioner testified that she did not need or obtain Mr. DeAngelis' authorization to make the loan. Therefore, she has not shown that the proceeds of such loan constituted money spent on Mr. DeAngelis' behalf, despite his testimony that the loan was made with his authorization in order to benefit Allied.

The foregoing items alone account for a total of about $47,286 not expended for Mr. DeAngelis' purposes. Such total does not include any of the clothing that the petitioner purchased for herself and her children, or the myriad other types of personal expenditures which, of necessity, must have followed from her mode of living.

In attempting to determine how much money was spent for Mr. DeAngelis, we are handicapped by the total lack of records of any sort—not even the most informal records exist. Of course, we do not hold the petitioner to the quantum of proof that is required of a taxpayer seeking to deduct travel, entertainment, and gift expenditures from his income as business deductions under section 162 and subject to section 274; the question here is not one of deductions from income, but rather one of determining whether the funds became the property of the petitioner or were merely held by her as an agent. Nevertheless, we cannot base our findings upon mere speculations, and the petitioner must carry her burden of proof by establishing some credible basis for allowing us to decide how much of the money that was transferred to her was not really hers. *Hoefle* v. *Commissioner*, 114 F. 2d 713 (C.A. 6, 1940), affirming a Memorandum Opinion of this Court; *Murray Humphreys*, 42 B.T.A. 857, 864–865 (1940), affd. 125 F. 2d 340 (C.A. 7, 1942); *Herbert G. Hanan, Executor*, 31 B.T.A. 521, 525 (1934); *Wood Corporation of Delaware*, 22 B.T.A. 1182, 1186 (1931), affd. 63 F. 2d 1023 (C.A. 6, 1933); *Rhode H. Gregory et al.*, 14 B.T.A. 907, 910 (1928); *Barnett Weiss*, 3 B.T.A. 228 (1925); 9 Mertens, Law of Federal Income Taxation, sec. 50.62 (1965).

When there are no documentary records, and such records are not explicitly required by statute or regulation, this Court can and often does find facts on the basis of oral testimony. In this case, we have the testimony of the petitioner with respect to the money she spent for Mr. DeAngelis' purposes; most of this testimony is very vague and general, except for her statements as to the purposes underlying certain expenditures represented by checks, about which she was specifically questioned by counsel. With respect to virtually every

check as to which she testified, the name or business of the payee sheds no light on the question of whether or not the expenditure was made in connection with Mr. DeAngelis' business; thus, such testimony is helpful to the petitioner's case only to the extent that we are willing to take her word for it. Also, we have the testimony of Mr. DeAngelis, which purports to be specific about names and amounts but does not generally fix the year of the alleged expenditure. We use the term "purports to be specific" because most of Mr. DeAngelis' testimony, upon analysis, proves to be nothing more than a collection of estimates, prepared wholly from memory without reference to any sort of data or records; and they contain apparent inconsistencies.

Even as to those parts of the testimony which might be specific enough to form the basis of an inference of fact, we are handicapped here by the "credibility gap" which permeated the testimony of the petitioner and Mr. DeAngelis. There are numerous examples of testimony given by the petitioner, and to a slightly lesser extent by Mr. DeAngelis, at this trial which squarely contradicted the same witness' previous statements to agents of the respondent. There are similar examples of situations in which the petitioner's testimony contradicted what Mr. DeAngelis had said, and vice versa. Worse yet, the petitioner admitted at trial, after the fact had been clearly demonstrated by counsel for the respondent, that she had knowingly given false testimony, under oath, at the hearing with respect to Mr. DeAngelis' bankruptcy in the U.S. District Court for the District of New Jersey. There were other instances with respect to which it is equally clear that she gave false testimony either at the bankruptcy hearing or at the trial before this Court, since the testimony given at the two proceedings is absolutely irreconcilable.

The petitioner testified at trial, and we have in effect concluded, that she was never employed by Mr. DeAngelis, never had an agreement of employment with him, and never received any compensation from him. However, at the hearing with respect to Mr. DeAngelis' bankruptcy, the petitioner testified under oath that she had an agreement with him whereby she was to perform certain business entertainment activities for him, that such occupation started in 1959, and that she received $25,000 per year from him for rendering such services. She also testified at the bankruptcy hearing that he had transferred to her $40,000 to make the downpayment on her house because he "owed it" to her as a result of services that she rendered on a business trip to Spain. We mention these details because they show us that the petitioner is capable of relating falsehoods in a rather specific and convincing way while under oath. The petitioner told the respondent's agent Discenza a similar story to the effect that

Mr. DeAngelis transferred the $40,000 to her to make the downpayment because he owed her the money. However, at trial, she testified that although Mr. DeAngelis did transfer to her $40,000 to make the downpayment, none of it was compensation; and that $25,000 of such amount was actually her money originally, of which $15,000 had been transferred to the petitioner by her mother in cash. In an attempt to explain the differing versions of the story that she presented at the bankruptcy hearing and at this trial, the petitioner testified that her previous statements had been "said under duress" because she "was looking to save * * * [her] reputation." Such an admission raises a question as to whether the petitioner would tell falsehoods under oath at this trial in order to avoid the payment of taxes.

The tax treatment of the Louant payments is not in issue, but we included our findings with respect thereto to demonstrate additionally that the petitioner knowingly gave false testimony at the bankruptcy hearing. Similarly, we note the seriously conflicting stories told by the petitioner and Mr. DeAngelis at various times with respect to the Comenzo account, about which more will be said later.

At one point in the trial before this Court, the petitioner testified that when Mr. DeAngelis transferred the funds to her, he did not tell her that the money could only be used for a particular purpose, or that it could not be used for other purposes. Rather, the petitioner testified that Mr. DeAngelis gave her money with no questions asked. Similarly, she had previously told the respondent's agent Discenza that she had received the money with no limitations, to use as she saw fit. However, at subsequent points in the trial, the petitioner testified that Mr. DeAngelis sometimes did tell her how to spend the money, that the money was understood by her to belong to Mr. DeAngelis at all times, and that she never received money from him for her own personal use except to the extent of the meals. Mr. DeAngelis testified that "every penny" he transferred to her was to be used as he directed, for specific purposes.

The petitioner's uncertainty as to the facts is demonstrated by her positive testimony to the effect that she spent some of the money that was transferred to her by Mr. DeAngelis to purchase a fur coat for a Mrs. Salama, the wife of one of Mr. DeAngelis' business associates from Spain. However, on cross-examination, she admitted that she did not really remember whether she paid for the coat with money that she had, or whether she billed the coat to Mr. DeAngelis and had him pay for it. Similarly, she testified that two checks aggregating $526 paid to a photography studio in 1963 "must be" for the photography services ordered by Mr. DeAngelis for a big outside party held for no special occasion; but cross-examination elicited the fact that the petitioner did not really know what the money was paid for, and

it might have been for pictures taken at an engagement reception held for the petitioner's daughter in a hotel. Such uncertainty of recollection clearly does not add to the weight to be accorded to her testimony. See *Continental Folding Paper Box Co.*, 17 T.C. 984, 993–994 (1951).

Much of Mr. DeAngelis' testimony as to the petitioner's expenditures on his behalf was not in any way corroborated, not even by the petitioner, who presumably knew best of all what she spent on Mr. DeAngelis' business purposes. Furthermore, even to the extent that the petitioner's and Mr. DeAngelis' testimony was mutually corroborative at trial, we found much of it to be unacceptable and unconvincing. Although the petitioner argues that such testimony was uncontradicted, it did contain some apparent inconsistencies. Furthermore, when testimony is as vague and general as that given by the petitioner and Mr. DeAngelis, direct contradictions are unlikely; and the lack of express contradiction in the testimony of such witnesses as the petitioner and Mr. DeAngelis does not require us to accept such testimony as truth. *Frank Imburgia*, 22 T.C. 1002, 1018 (1954), and cases cited therein; see also *Quock Ting* v. *United States*, 140 U.S. 417, 420–421 (1891); *Hallabrin* v. *Commissioner*, 325 F. 2d 298, 301 (C.A. 6, 1963), affirming a Memorandum Opinion of this Court; *Mickler* v. *Fahs*, 243 F. 2d 515, 518 (C.A. 5, 1957); *Archer* v. *Commissioner*, 227 F. 2d 270, 273 (C.A. 5, 1955), affirming a Memorandum Opinion of this Court; *Boyett* v. *Commissioner*, 204 F. 2d 205, 208 (C.A. 5, 1953), affirming a Memorandum Opinion of this Court; *Heil Beauty Supplies* v. *Commissioner*, 199 F. 2d 193, 195 (C.A. 8, 1952), affirming a Memorandum Opinion of this Court; *Burka* v. *Commissioner*, 179 F. 2d 483, 485 (C.A. 4, 1950), affirming a Memorandum Opinion of this Court; *Joe Balestrieri & Co.* v. *Commissioner*, 177 F. 2d 867, 874–875 (C.A. 9, 1949), affirming a Memorandum Opinion of this Court; *Greenfeld* v. *Commissioner*, 165 F. 2d 318, 319–320 (C.A. 4, 1947), affirming a Memorandum Opinion of this Court; *Slayton* v. *Commissioner*, 76 F. 2d 497, 498–499 (C.A. 1, 1935), affirming 29 B.T.A. 931 (1934), certiorari denied 296 U.S. 586 (1935); *Kentucky Distributing Co.*, 17 T.C. 312, 317–318 (1951); 2 Casey, Federal Tax Practice, sec. 8.8.

As we pointed out earlier, much of Mr. DeAngelis' more specific testimony consisted largely of estimates; we need not reiterate the total lack of records on the part of the petitioner. Suffice it to say that the bias of Mr. DeAngelis is obvious, and, given the past conduct of the petitioner and Mr. DeAngelis with respect to the issues involved in this case, and his conviction of a felony, most of their testimony must be viewed as unreliable, at best. See *Abraham Galant*, 26 T.C. 354, 364 (1956); *Lillian Kilpatrick*, 22 T.C. 446, 455 (1954), affd.

227 F. 2d 240 (C.A. 5, 1955) ; *W. L. Kann*, 18 T.C. 1032, 1044 (1952), affd. 210 F. 2d 247 (C.A. 3, 1953), rehearing denied 210 F. 2d 255 (C.A. 3, 1954), certiorari denied 347 U.S. 967 (1954).

Despite our serious doubts as to much of the testimony given by the petitioner and Mr. DeAngelis, we believe that the record establishes nevertheless that the petitioner did expend some money on Mr. De-Angelis' behalf and pursuant to his direction, for the furtherance of his business purposes. The amounts that we have found to be so expended constitute our best estimates based upon the entire record. However, the inexactitude and imprecision revealed by the record have been weighed against the petitioner, as they are of her own making. *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930) ; *Maurice P. O'Meara*, 8 T.C. 622 (1947). The *Cohan* rule originated in the context of deductibility of travel and entertainment expenses from income. However, similar estimates have been used in diverse other circumstances in which the taxpayer has not clearly shown the proper figure to be used by the Court. See *Duke Power Co.*, 49 T.C. 14, 25–26 (1967), involving a power company's constructive average base period net income; *Henry B. Mikelberg*, 23 T.C. 342, 352 (1954), affd. 234 F. 2d 34 (C.A. 3, 1956), certiorari denied 352 U.S. 968 (1957), involving the amount of a taxpayer's cash hoard; *Prosperity Co.*, 17 T.C. 171 (1951), affd. 201 F. 2d 499 (C.A. 2, 1953), involving the basis of property; and *Farmers Creamery Co. of Fredericksburg, Va.*, 14 T.C. 879, 883 (1950), involving the amount of loss of depreciated items in inventory. Although the *Cohan* rule is no longer applicable to the deductibility of expenditures for travel and entertainment (sec. 274(d) ), it may still be applied in other situations.

Our Findings of Fact set forth our best estimates as to the petitioner's expenditures for Mr. DeAngelis' purposes with respect to clothing (for him), entertainment, and gifts. Beyond such estimates, we feel that we would be indulging in meaningless guesswork. We have found that the petitioner used some of the funds transferred to her to purchase gifts for and to entertain the wives of business associates of Mr. DeAngelis. Although the petitioner claimed to have purchased large gifts, including fur coats and a portrait, we have not been convinced by such testimony; there are no checks reflecting such substantial purchases, and it would be most unusual to pay cash for purchases of such magnitude.

Mr. DeAngelis' testimony refers to a number of instances in which he allegedly took back money from the petitioner when he needed such money for business purposes. He claimed that such payments included $7,000 to finance another man's business trip to Pakistan on Allied's behalf, $7,500 extracted from Mr. DeAngelis by a Pakistani in return for the latter's influence in seeing that Allied received certain business,

$10,000 for an employee of a company with which Allied had business dealings, and $10,000 for a destitute widow of a prominent Spanish official. However, we are unconvinced by such testimony. We need not reiterate our reasons for mistrusting the unsupported testimony of Mr. DeAngelis and the petitioner. Furthermore, it struck us as most peculiar that Mr. DeAngelis, a sophisticated businessman with complicated business dealings involving frequent transfers of substantial sums of money, would regularly transfer money that was needed for business purposes to the petitioner, and then be required to ask her to return such money in piecemeal fashion so that his business expenses could be paid. Here, we are not referring to the types of expenditures which the petitioner could normally be expected to make out of her own pocket, such as for the entertainment of the wives of Mr. DeAngelis' associates.

We deal next with the transfers made by Mr. DeAngelis into the Comenzo account in the petitioner's name, which transfers aggregated $32,406 in 1959. With respect to such transfers, the respondent has determined in docket No. 4587–66 that they were loans to the petitioner in 1959 which ripened into compensation in 1960 upon Mr. DeAngelis' forgiveness of the debt; alternatively, he has determined in docket No. 3596–68 that they were loans to the petitioner in 1959 which became gifts in 1960 upon forgiveness of the debt. The original deficiencies and penalties asserted by the respondent were based upon such transfers being compensation or gifts in 1960. Later, however, the respondent amended his answer in docket No. 4587–66 to allege that, if this Court does not find that the transfer originated as loans in 1959 and became compensation payments in 1960, then it should find that the transfers were compensation payments in 1959, and the deficiency in the income tax and associated penalties for that year should be increased accordingly. A similar amendment of the answer was made in docket No. 3596–68, alleging that the transfers were gifts in 1959, and that the deficiency in the gift tax and associated penalties for that year should be increased accordingly.

The petitioner's response to such allegations is that the money involved in those transfers was never really received by the petitioner in any manner, and that the account belonged in fact to Mr. DeAngelis even though it was in the petitioner's name. In this connection, the petitioner stresses that she did not manage the trading of commodities that was conducted through the account and that she had little knowledge of how such trading worked.

We have found that Mr. DeAngelis did in fact manage the conduct of the trading activities conducted through the account. However, the petitioner utterly fails to convince us that the account was not hers in fact. Her ownership of the money therein is not necessarily inconsistent

with Mr. DeAngelis' managing the purchases and sales of the commodities. Both the petitioner and Mr. DeAngelis had previously made statements to agents of the respondent to the effect that the account belonged entirely to the petitioner, that she received the proceeds therefrom, and that Mr. DeAngelis had no ownership interest in either the account or its proceeds. Furthermore, the petitioner testified to this effect in the bankruptcy proceedings of Mr. DeAngelis. At such proceedings, she testified that she used the proceeds of the account for her personal living expenses. Also, the petitioner consistently reported the income from the Comenzo account on her individual Federal income tax returns. Furthermore, we know that the issuance of one check for $15,674.50 from the Comenzo account to the petitioner preceded by 1 day her deposit in her checking account of an identical amount.

In light of such facts, we think that the testimony of the petitioner and Mr. DeAngelis at the present trial that the account really belonged to him alone, and that she received none of the proceeds, was patently false. Mr. DeAngelis attempted to explain the fact that the account was in the petitioner's name by saying that it was because he did not want his competitors to find out that he was behind the trading that was done through such account. However, he gave no indication as to how his competitors would find out what trading was being done through his account by his brokerage house even if the account *had* been in his own name; his explanation rings hollow upon the ears of the Court. Especially in light of the inconsistent statements and representations made by the petitioner herself and Mr. DeAngelis, we are unable to find that the petitioner has carried her burden of proof with respect to the ownership of the Comenzo account.

This leaves only the questions of in which year the transfers were received by the petitioner, and whether they were received as gifts or payments of compensation. The evidence shows that the money was transferred into her account in 1959, and there is absolutely no indication in the record that such transfers originated as loans that were later forgiven. Therefore, we have concluded that the funds were not loans to the petitioner, and were received by her in 1959. For the same reasons that we discussed earlier with respect to finding that the stipulated transfers were gifts, we find that these transfers were gifts.

Next, we deal with the question of whether the amounts that Mr. DeAngelis paid directly to John Bellochhio, trading as the Glenn Contracting Co., and Robert Smith, in 1960, for improvements done on the petitioner's real property in Tenafly, were transfers to the petitioner at the time such payments were made, and, if so, whether they were transferred as compensation or gifts. The petitioner advances the argument that the payments to John Bellochhio or the Glenn Contracting Co. were not equivalent to transfers to her because they in-

volved landscaping work done in order to make the premises more suitable to Mr. DeAngelis' business meetings, and that the payments to Robert Smith were not equivalent to transfers to her because they involved work performed to build an apartmentlike living space for Mr. DeAngelis' use in the basement of the house.

It seems clear to us that Mr. DeAngelis enjoyed the primary use of the basement living quarters during the years that he lived in the house, although it seems that he lived there at the sufferance of the petitioner, there being no indication that his right to occupy those quarters was based upon any legally binding agreement. It is not clear that he derived any more benefit than anyone else living in the house from the landscaping work. However, regardless of such usage, it seems clear that both the improvements to the basement and the landscaping work served to increase the value of the house, which was owned by the petitioner alone. The former, in particular, was an addition of permanent nature. There is no indication in the record that the increase in the value of the real estate as a result of such improvements was less than the cost of such work. Similarly, there is no indication as to the value of Mr. DeAngelis' usage of the basement apartment; but it seems clear that such apartment remained as part of the realty after he took up residence elsewhere. The petitioner has failed to carry her burden of proof on this issue, and therefore, we sustain the respondent's determination that Mr. DeAngelis' payments for improvements to the petitioner's realty were tantamount to payments to her. For the same reasons that we set forth earlier, we hold that such payments were gifts to the petitioner rather than compensation. They constituted a transfer for less than an adequate consideration in money or money's worth. *Commissioner* v. *Wemyss*, 324 U.S. 303, 306 (1945).

Aside from her contention that the transfers to her and expenditures on her behalf were not gifts, the petitioner has not challenged in any way the respondent's determination with respect to gift tax liability, and therefore we sustain such determination to the extent that we have found the transfers and expenditures to be gifts. It is clear that if the donor's gift tax is not paid when due, then the donee is liable, as transferee, for the amount of such tax liability to the extent of the value of the gifts received. Sec. 301.6901–1. Proceed. & Admin. Regs.; *Fred J. LaFortune*, 29 T.C. 479, 488 (1957), affd. 263 F. 2d 186 (C.A. 10, 1958). Since Mr. DeAngelis did not pay the gift tax owing for the years in issue, we hold that, in docket No. 3596–68, the petitioner is liable as transferee for the gift tax due from Mr. DeAngelis with respect to the gifts that we have found she received.

The petitioner has not challenged the propriety of the respondent's imposition of the penalty under section 6651(a) by reason of Mr. DeAngelis' failure to file gift tax returns. It is undisputed that no such

returns were filed. Therefore, we sustain the penalty to the extent appropriate in light of our findings as to the amounts of gifts made by Mr. DeAngelis.

Finally, we must determine whether, as the respondent contends, the petitioner conceded three minor issues in docket No. 4587–66. One such issue involves interest income from savings accounts which the petitioner allegedly failed to report. The respondent determined the amounts of such unreported interest income as $91 for 1959, $71.59 for 1960, $316.35 for 1961, and $292.52 for 1962. The petitioner has introduced no evidence whatsoever with respect to such alleged income, and therefore the respondent's determinations must be sustained.

The second such issue involves certain of the petitioner's itemized deductions which the respondent disallowed. In his determination of the petitioner's income for the years in issue, he took the position that the funds she had received from Mr. DeAngelis were income received in return for her services as a "hostess," and, consistently with such theory, the respondent allowed certain expenditures related to the petitioner's house as deductible business expenses. However, with respect to items such as the interest paid on the mortgage and the taxes paid on the house, the petitioner had already taken itemized deductions; therefore, the respondent disallowed such itemized deductions to the extent that the items were allowed as business deductions. The respondent never questioned whether the payments were made in the alleged amounts for the alleged purposes. We have, of course, rejected the respondent's theory that the amounts received by the petitioner from Mr. DeAngelis constituted business income; therefore, it follows that the petitioner is not entitled to the "business deductions" that the respondent allowed in his determination. Consequently, the itemized deductions claimed by the petitioner other than for medical expenses are allowable as claimed, and any medical expense deductions disallowed by the respondent solely because of the alleged increase in her gross income should be adjusted appropriately in light of our findings.

The last such issue involves the respondent's determination in docket No. 4587–66 that the petitioner is liable for additions to tax under section 6654 for 1959, 1960, and 1963. Such penalty was determined because of the petitioner's apparent failure to pay estimated income tax for those years. Obviously, the amount of any such penalty will be substantially reduced by virtue of our finding that the money transferred to the petitioner by Mr. DeAngelis was not taxable income; however, the petitioner has shown us no reason why such penalty is not applicable with respect to the income that she did receive in those years. Therefore, we sustain the determination of that penalty to the

extent that it is applicable, if at all, in the light of our findings in this case.

*Decisions will be entered under Rule 50.*