FIRD H. SINK and MARY A. SINK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sink v. Commissioner
Docket No. 6828-71.
United States Tax Court
T.C. Memo 1974-302; 1974 Tax Ct. Memo LEXIS 17; 33 T.C.M. (CCH) 1398; T.C.M. (RIA) 740302; December 4, 1974, Filed. *17 P systematically misappropriated funds from her employer's business cash box and concealed such misappropriations by altering her employer's books. The income from the embezzlement was not reported for Federal income tax purposes. Held, the underpayments of Federal income taxes on the embezzled funds were due to fraud on the part of P. Howard J. Beck, Jr., for the petitioners. Robert D. Grossman, Jr., for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Year
Deficiency
Addition to tax under sec. 6653(b) [1]
1965
$1,232.13
$ 616.07
1966
2,264.25
1,132.13
1967
344.43
172.22
The issues for decision are whether Mr. and Mrs. Sink had unreported income from embezzled funds and whether underpayments in Federal income taxes for the years 1965 through 1967 were due to fraud on the part of Mrs. Sink. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, *18 Fird H. Sink and Mary A. Sink, are husband and wife, who resided in Martinsville, Va., at the time of filing their petition herein. Mr. and Mrs. Sink filed joint Federal income tax returns for the years 1965, 1966 and 1967 with the Mid-Atlantic Service Center, Philadelphia, Pa. The petitioners had four minor children whom they claimed as dependents on their Federal income tax returns for those years. Mrs. Sink has worked as a bookkeeper since 1948. She has also prepared income tax returns for individuals and partnerships for a fee. She has various books in her home which relate to the laws of taxation and which she has read. Mrs. Sink was cognizant that embezzled funds should be reported on an individual's Federal income tax return. Building Supply Co., Inc. (Supply), is a Virginia corporation having its principal place of business in Martinsville, Va. Supply has been engaged in the sale of building supplies in and around Martinsville for many years. Mrs. Sink was employed as Supply's bookkeeper from 1964 through February 1967, when she was fired. During that period, she was the custodian of, and in charge of, Supply's books of account, and she made most of the entries *19 in those books. During January 1967, Supply's management noticed that there were discrepancies between amounts entered in Supply's cash receipts journal and amounts reflected by individual customer's accounts as being due. In early 1967, Mr. Robert J. Turner, who is now deceased but who was then vice president, manager, and shareholder of Supply, requested William Z. Ford, a certified public accountant, to conduct an audit of Supply's books. Mr. Ford had conducted annual audits of Supply's books commencing in 1960, but in February of 1965, he was advised that no audit would be performed for that or succeeding years. During his audit in 1967, he discovered discrepancies in the books, and his audit disclosed a cash shortage of $19,652.05, which occurred over the period August 1, 1964, through January 31, 1967. A total of $18,675.51 was misappropriated from Supply during the years 1965 through 1967 as follows: Year
Amount 1965
$ 6,315.38
1966
10,530.04
1967
1,830.09
The missing funds had been removed from the proceeds of cash sales and cash collections of customer's accounts. In Mr. Ford's opinion, Supply did not have an adequate system of cash control, *20 and on several occasions, he had expressed his concern over the cash control system to Supply's management; he had also discussed such problems with Mrs. Sink. He had suggested to Supply's management that his firm be permitted to make a survey of the cash control system, but the management had not asked him to do so. Several employees of Supply, including Mrs. Sink and Mr. Turner, had access to its petty cash fund. Mrs. Sink continued to work for Supply throughout the period of Mr. Ford's audit in 1967. During the course of that audit, he asked Mrs. Sink to provide him with a complete list of the entries on Supply's books that had been altered, but she provided him with only an incomplete list of the altered entries. To the extent she was requested to do so, Mrs. Sink provided Mr. Ford with business records relevant to his inquiry, such as bank statements, cancelled checks, and deposit slips. It was not until after Mr. Ford discovered incorrect additions, alterations, and falsifications on Supply's books that Mrs. Sink admitted to him that she was responsible for such changes. Prior to that time, she refrained from revealing the embezzlement of Supply's funds and the falsification *21 of its books to its president, although she had opportunities to do so. Also, in 1965 or 1966, IRS agents conducted an audit of Supply, and she failed to reveal to them the incorrect entries which she made in the Supply books. In order to conceal the cash shortages, Mrs. Sink commenced falsifying Supply's cash receipts journal in 1964 and continued doing so until January 1967. Mrs. Sink employed several methods designed to hide the shortages: she showed cash receipts figures on the journal which differed from the actual amounts paid by customers; she entered figures on the journal in amounts different from the amounts credited to customers' accounts; and she recorded receipts in amounts different from the amounts entered on the business's bank deposit tickets. In order to achieve such disparities, Mrs. Sink deliberately added amounts incorrectly and made erasures of correct entries and substituted incorrect entries in their place. Supply's books were not kept posted when Mrs. Sink was away from work. She was absent from February 9, 1965, through March 11, 1965, and during her absence, $976.54 in cash accumulated from sales. The accumulated cash was not deposited in Supply's *22 bank account after she returned, and receipts of March 1965 were later substituted for the undeposited accumulated cash. On July 18, 1967, Supply brought a civil action against Mr. and Mrs. Sink seeking to recover a money judgment of $19,652.05, the amount Mr. Ford's audit disclosed had been misappropriated. Supply alleged that, during the course of her employment, Mrs. Sink had converted that amount to her own use from Supply and that Mr. Sink had benefited from Mrs. Sink's conversion. Mr. and Mrs. Sink filed their responsive pleading on August 6, 1967, wherein they denied Supply's allegations of misconduct on both their parts. John W. Carter of Danville, Va., was hired by Mr. and Mrs. Sink to defend their interests in Supply's action against them. Mr. Carter engaged A.M. Pullen & Company (Pullen), a firm of certified public accountants unrelated to Mr. Ford's accounting company, to review the audit report Mr. Ford had prepared concerning the misappropriation of Supply's funds. Pullen examined the audit and found no errors or discrepancies. In connection with his representation of Mr. and Mrs. Sink, Mr. Carter met with Mrs. Sink to learn from her the facts of the situation *23 and to discuss Supply's case against her. Mrs. Sink told Mr. Carter that it was Mr. Turner who had taken the missing funds. Mr. Carter considered Mrs. Sink's assertion but found no corroboration to substantiate her allegation. He also reviewed Pullen's findings concerning the misappropriations and was satisfied with their accuracy. After assessing the facts of the case, Mr. Carter concluded that it would be difficult to convince a jury of her innocence; thus, he explained to her that he could not present a plausible defense on behalf of her and Mr. Sink. Mr. Carter was also concerned that should the case go to trial, there was a chance that Mrs. Sink would be criminally prosecuted for embezzlement. Mr. Carter met Supply's counsel and negotiated a settlement whereby Supply was to release Mr. Sink from all liability and Mrs. Sink was to agree that Supply was entitled to recover $19,652.05, plus interest, from her. He understood that the effect of the settlement was that Supply could not collect from the jointly owned property of Mr. and Mrs. Sink, since Mr. Sink was not liable; nor could it collect from Mrs. Sink since she owned no property in her own name. Mr. Carter informed *24 Mrs. Sink that he had worked out a basis of settlement and recommended that she agree to it. He proposed to file a consent judgment incorporating the settlement, and he understood that she did not oppose its being entered against her. Supply's counsel drafted the judgment reflecting the terms of the settlement. Mr. Carter consented to and signed the jdugment as counsel for Mr. and Mrs. Sink, and it was entered on March 20, 1968. No appeal was taken from the judgment within the time provided by the laws of the State of Virginia. On September 25, 1968, Supply filed a bill in chancery against Mrs. Sink to enforce the judgment. She engaged Mr. Carter to defend her in the action, and he filed an answer to the bill on her behalf on October 20, 1968, wherein she denied that she possessed any assets which could be used to satisfy the judgment. On November 8, 1968, Supply's counsel took Mrs. Sink's deposition with a view toward locating assets to satisfy Supply's claim, but the deposition revealed no such assets. After her deposition was taken, Mrs. Sink heard nothing further concerning Supply's efforts to collect on its judgment, and on December 14, 1972, the bill was dismissed. *25 Mr. and Mrs. Sink had the following total assets and liabilities: December 31
Total Assets
Total Liabilities 1964
$21,908.23
$ 18,340.76
1965
21,932.98
15,457.60
1966
25,978.57
17,130.34
1967
24,848.26
17,750.21
Mr. and Mrs. Sink purchased furniture and automobiles on credit, and from 1964 through 1973, they always had outstanding a number of financial obligations. Throughout those years, they had outstanding obligations to several banks, finance companies, and stores for purchases on credit. They were consistently late in making monthly payments on those accounts and often made only occasional payments. In 1964, one creditor sued them for failure to meet their obligation. Mr. and Mrs. Sink reported total gross incomes of $9,031.35, $9,482.51, and $10,168.39 on their 1965, 1966, and 1967 joint Federal income tax returns, respectively, and they reported taxable income of $2,517.80, $3,493.39, and $3,792.43 for 1965, 1966, and 1967, respectively. In his notice of deficiency, the Commissioner determined that Mr. and Mrs. Sink failed to report income embezzled from Supply during 1965, 1966, and 1967 in the amounts of $6,315.38, $10,530.04, *26 and $1,830.09, respectively, and that part or all of the underpayments of Federal income taxes was due to fraud. The Commissioner has conceded that he has not demonstrated that underpayments in Federal income taxes for the years at issue were due to fraud on the part of Fird H. Sink. OPINION Most of the controversy in this case concerned whether Mrs. Sink received the embezzled funds, and we consider that issue first. Mrs. Sink's position at Supply afforded her the opportunity to take funds from Supply and to conceal such embezzlement. Cash was withdrawn, and Mrs. Sink had access to Supply's cash box. Supply's accountant determined that Supply did not have an adequate system of cash control and apprised Mrs. Sink of such fact. Although other employees also had access to the cash box, Mrs. Sink had sole custody of and control over the books which reflected the amount of cash which came into the business. Mrs. Sink admitted that she took advantage of her status as bookkeeper to alter the books to hide the fact that funds were missing. There was no one else at Supply who had the opportunity both to take cash and to conceal such actions. In addition, Mr. and Mrs. Sink's financial *27 situation was such as to have provided Mrs. Sink with a strong motive for utilizing the opportunity to embezzle funds. During the years 1965 through 1967, their combined income was moderate, and in addition to themselves, they had four children to support. They had heavy debts throughout the years 1964 through 1967. Payments were constantly due on such debts, and Mr. and Mrs. Sink were consistently tardy in making their payments. They were sued once in 1964 for failing to meet their obligation on an account. On several accounts calling for monthly payments, they made only irregular payments. Thus, it is clear that the Sinks had considerable difficulty in stretching their funds to meet their financial obligations. Moreover, the timing of the embezzlement coincided with the period of Mrs. Sink's employment at Supply. Funds were missing beginning in 1964, shortly after Mrs. Sink was employed by Supply. She was absent from work for part of February and March 1965; during that period, cash accumulated in the cash box. Such cash was not deposited after her return, and payments received after her return were used to conceal her failure to deposit the accumulated cash. The Commissioner's *28 modified net worth computation also supports an inference that Mrs. Sink received the embezzled funds in 1965 and 1966. Although that computation did not constitute a complete reflection of the changes in the net worth of Mr. and Mrs. Sink, it does suggest that their financial situation improved significantly in 1965 and 1966 and worsened again in 1967. During those years, their known income remained at substantially the same level; yet, they were able to reduce their financial obligations materially in 1965 and increase significantly their assets in 1966 without a corresponding increase in liabilities, but in 1967, their obligations again increased. Thus, there was a distinct correlation between the times when the funds were embezzled from Supply and the changes in the financial situation of Mr. and Mrs. Sink. Mrs. Sink alleged that Mr. Turner had taken the missing funds from Supply and that her involvement was limited to falsifying the books on his instructions. At trial, Mrs. Sink attempted to explain her motive for falsifying the books but failed to present a credible story.At one point, she stated that she was concerned lest Mr. Turner lay the blame for the embezzlement *29 solely on her, unless she cooperated with him; but she failed to explain for what she could be blamed if she were in fact innocent. She also stated that she falsified the books because she wanted Mr. Turner to be punished for making many, rather than just a few, false entries. Such confused and self-contradictory testimony fails to explain why she helped Mr. Turner conceal his defalcations. Moreover, her testimony in general was often vague, confusing, and at times, contradictory. Finally, she offered no evidence to corroborate her story, and the evidence concerning Mr. Turner's interest in Supply and his role in the conduct of its affairs makes her story improbable.See Lillian Pascarelli, 55 T.C. 1082 (1971), affd. without pub. opinion 485 F.2d 681 (C.A. 3, 1973). Considering all the evidence, we are convinced that Mrs. Sink received some or all of the funds embezzled from Supply. It was cash that was embezzled, and she had access to the cash; she alone had custody of the books and made the entries designed to conceal the defalcations; she had the motive, and her financial situation ebbed and flowed in concert with the embezzlement of the funds. Her *30 story that Mr. Turner received the funds and that she altered the books to conceal his misconduct was not convincing. Although the evidence is circumstantial, such evidence can constitute the basis for concluding that there has been a fraudulent understatement of income. M. Rea Gano, 19 B.T.A. 518 (1930). The evidence in this case justifies such a conclusion. Moreover, the petitioners have the burden of proving that Mrs. Sink did not receive the amount of income determined by the Commissioner, and their evidence has failed to carry that burden. Mrs. Sink's general allegation with respect to Mr. Turner is insufficient to establish that he actually received any of the embezzled funds. Having concluded that Mrs. Sink received the embezzled funds, we now reach the question as to whether the failure to report such income was fraudulent. Fraud consists of an intentional evasion of taxes believed owed. Mitchell v. Commissioner, 118 F.2d 308 (C.A. 5, 1941). Since direct evidence of the requisite intent is often unobtainable, there may be resort to relevant circumstantial evidence. M. Rea Gano, supra.The Commissioner must show the requisite *31 intent by clear and convincing evidence. Rule 142(b), Tax Court Rules of Practice and Procedure; Estate of Millard D. Hill, 59 T.C. 846 (1973). Mrs. Sink engaged in a program of embezzling funds from her employer beginning in the first year of her employment as the bookkeeper and continuing until she was fired. Her defalcations and concealments were repeated and consistent. The funds she received were in cash and thus could not be easily traced to her. She persistently denied that she altered the books, so long as she had any hope of concealing the facts. Such circumstances manifest that she participated in a scheme to defraud her employer, with knowledge of the impropriety of her actions. In addition, she knew that embezzled funds were reportable income. The facts bring this case squarely within the holding and rationale of George C. McGee, 61 T.C. 249 (1973). In that case, an employee defrauded his employer of funds through systematically inflating customers' bills; in concluding that the employee's failure to report the embezzled funds constituted fraud, the Court stated at page 260 that: it is a fair inference that a man who will misappropriate *32 another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax. * * * In view of the circumstances, we find and hold that the petitioners have failed to report the amount of income determined by the Commissioner and that such failure was fraudulent. Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954. ↩