ROBERT W. RHODES and ELIZABETH J. RHODES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rhodes v. Commissioner
Docket No. 1385-75.
United States Tax Court
T.C. Memo 1977-33; 1977 Tax Ct. Memo LEXIS 411; 36 T.C.M. (CCH) 149; T.C.M. (RIA) 770033; February 7, 1977, Filed Colin A. Norberg, for the petitioners. Justin S. Holden, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax and an addition to tax under section 6653(b), I.R.C. 1954, [1] for the calendar year 1968 in the amounts of $5,576.61 and $2,788.31, respectively. On brief respondent conceded that petitioners were not liable for the addition to tax under section 6653 (b). However, on March 4, 1976, respondent amended his answer to the petition to affirmatively plead in the alternative *412 that petitioners are liable for an addition to tax under section 6653(a) in the amount of $278.83. Some of the issues raised in the pleadings have been disposed of by the parties, leaving for our decision: (1) Whether under section 102 the receipt of a parcel of real property by Robert W. Rhodes may be excluded from petitioners' gross income as a gift; and (2) whether petitioners' failure to report income from receipt or sale of the real property or from receipt of certain commission checks was due to negligence or intentional disregard of rules and regulations. FINDINGS OF FACT All of the facts have been stipulated. However, included in the stipulation is a transcript of the trial in United States v. Robert W. Rhodes. [2] The parties stipulated that the witnesses identified in this transcript, if called to testify in the instant case, would testify substantially as they did in United States v. Robert W. Rhodes, but specifically did not stipulate as to the truth of any statement of any witness and reserved the right to object to any such statement on the ground of hearsay. Because *413 of the nature of the stipulation, we find the facts as stipulated other than the facts contained in the transcript of the testimony in the Robert W. Rhodes case. We will include in our findings such facts from the testimony in the Robert W. Rhodes case as we consider material and established by competent evidence. Petitioners, husband and wife, filed a joint Federal income tax return for the calendar year 1968 with the Director, Internal Revenue Service Center, Andover, Massachusetts. Petitioners resided at Meredith, New Hampshire at the time the petition in this case was filed. Petitioners kept their records and filed their Federal income tax returns on the cash basis. For the year here in issue, Robert W. Rhodes prepared petitioners' Federal income tax return without the assistance of an accountant or an attorney. Robert W. Rhodes (petitioner) was Commissioner of Safety for the State of New Hampshire from 1962 through 1968. In 1967 and 1968, he was a selectman of the Town of Meredith, New Hampshire. Petitioner received a B.A. in Economics from the University of Massachusetts in 1946. He *414 was Town Manager of Meredith from 1950 to 1954 and Town Manager of Ashland, New Hampshire from 1954 to 1958. In 1962, petitioner obtained a real estate broker's license from New Hampshire, which he has exercised only in connection with sales of property subsequently described herein as Patrician Shores. In 1967, petitioner was contacted by Monsignor Richard Boner about plans of the Catholic Church to sell property containing about 86 acres of land near Meredith. This property, named St. John's Seminary Camp, had previously been used as a summer camp. Monsignor Boner had been asked by His Eminence Richard Cardinal Cushing to try to find a buyer for the property. Because of prior association with petitioner and petitioner's interest in the community of Meredith, Monsignor Boner discussed the church's plans with petitioner and asked his assistance in disposing of the property. Monsignor Boner made it clear in his initial conversation with petitioner that petitioner would not receive a commission from the church for his efforts. Petitioner informed a friend, Judge Kenneth Shaw, of the opportunity to purchase the property. Judge Shaw was a practicing lawyer and a Probate Judge *415 in New Hampshire. He had been involved in several acquisitions of land in the area comparable to the St. John's Seminary Camp property. Judge Shaw became interested in the property after examining it and interested another party, Mr. Louis Gagliardi, in joining with him in an attempt to buy it. Mr. Gagliardi, a land developer and building contractor, had never met petitioner before the land purchase opportunity arose. Judge Shaw had petitioner arrange a meeting with church officials to negotiate the purchase. The meeting was arranged with Cardinal Cushing in Boston, and petitioner, Judge Shaw, Mr. Gagliardi, and Monsignor Boner drove to the meeting together. Cardinal Cushing negotiated with Judge Shaw and Mr. Gagliardi personally, and the parties agreed to a cash price of $255,000.Mr. Gagliardi took the contract for sale in his own name and later assigned it to a corporation subsequently formed by him, Judge Shaw and another investor, Mr. Foyto. [3] This corporation, Patrician Shores, Inc. (the corporation), was organized in July of 1967. Mr. Gagliardi became president and served until July of 1972, when the corporation was sold to Mr. Oscar E. Lussier, Jr. As president, *416 Mr. Gagliardi had the sole authority to sign deeds and to loan funds of the corporation. The purchase was substantially financed by a loan to the corporation from Sugar River Savings Bank, which received a mortgage on the property. Judge Shaw was that bank's attorney. Closing of the sale was held at petitioners' home in Meredith in September of 1967. Petitioner made all the arrangements. It was attended by petitioners, Cardinal Cushing, Monsignor Boner, bank representatives, Judge Shaw, Mr. Gagliardi and Mr. Foyto. The event received considerable local publicity. Both Judge Shaw and Mr. Gagliardi were pleased with the results of the transaction. They also knew that petitioner would not receive any commission from the church for his activities. In fact, at no time did petitioner seek a commission. [4] Judge Shaw and Mr. Gagliardi felt that petitioner should receive something for his efforts and decided to give him a lot from the development after the land was platted. They did not consider giving petitioner a cash commission. Judge Shaw had asked Cardinal Cushing if he had any objection *417 to their giving a lot to petitioner and was assured that the Cardinal would not object to such a transfer. At the closing, Judge Shaw informed petitioner that he would receive a lot from the development, then named Patrician Shores, as soon as plans for the property were developed. After the lots were laid out by Mr. Gagliardi, petitioner was given his choice of lots, and he selected the lot later designated Lot No. 80. The lot was not deeded to petitioner at that time, but Lot No. 80 on the corporation's plat was marked "Sold" by Mr. Gagliardi in September of 1967 to prevent anyone from selling it before it could be transferred to petitioner. After the land purchase, petitioner performed numerous small services for the corporation. He frequently visited the development and would show lots to customers when others were busy. He also picked up items in the state capitol needed by the corporation. During 1968, petitioner received three commission checks from the corporation in the amounts of $1,000, $750 and $500 for his assistance in selling certain lots. Judge *418 Shaw and Mr. Gagliardi had anticipated such services by petitioner from the outset of the venture. On September 26, 1967, petitioner borrowed $2,500 from the corporation. Repayment was made a condition to transfer of the lot promised to petitioner. The loan was repaid on September 10, 1968, 2 days before petitioner received a deed to the lot. Petitioner also received a loan of $7,743.75 from a bank in late 1967. On December 26, 1967, he arranged with the corporation for Lot No. 80 to be used as collateral for the loan. The initial loan became due June 23, 1968. In connection with an extension of the loan, the corporation executed an Agreement with the bank on August 7, 1968, stating that it would either convey Lot No. 80 to petitioner on or before September 9, 1968, or pay to the bank $7,500 for petitioner in lieu of the conveyance. Petitioner received the deed to Lot No. 80 of Patrician Shores on September 12, 1968. On September 10, 1968, the corporation had paid $4,000 to the Sugar River Savings Bank for a release of the lien which the bank held on the lot stemming from its mortgage on the corporate property. The transfer of Lot No. 80 was not treated as a business *419 expense on the corporation's books. The corporation had written off as expense all but $2,300 of its full basis in the Patrician Shores property before sale of the corporation in July of 1972. On October 8, 1968, petitioner sold Lot No. 80 to Erik and Hazel Anderson for $18,000. He incurred costs of the sale, including advertising, commission, and closing costs, in the amount of $1,113.81. The deed of the lot to petitioner and his deed to Mr. and Mrs. Anderson were recorded the same day. On their Federal income tax return for the calendar year 1968, petitioners did not report the receipt or sale of Lot No. 80 of Patrician Shores or the receipt of the three commission checks from the corporation, nor did petitioners report any income therefrom. Also, petitioners failed to deduct or otherwise apply the costs of selling the lot.
Respondent, in his notice of deficiency to petitioners, determined a deficiency in income tax resulting from the failure to include in gross income the value of the lot and the amount of the commission checks received. Respondent determined that the lot was received as a commission and that its fair market value when received was $18,000. Respondent *420 also allowed the costs of sale of the lot in the amount of $1,113.81 as an offset against the income realized on its receipt. Respondent increased petitioners' gross income as reported by $2,250, attributable to the commission checks, and by $16,886.19, attributable to the receipt of the lot. [5]
OPINION Gross income is broadly defined in section 61, in part, as follows: SEC. 61. GROSS INCOME DEFINED. (a) General Definition.--Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; [Emphasis added.] * * *
(3) Gains derived from dealings in property; Respondent argues that the receipt by petitioner of Lot No. 80 of Patrician Shores falls within this definition and thus constitutes gross income to petitioners. It is petitioners' contention that the lot was "property acquired by gift" and that it *421 was properly excluded from gross income pursuant to section 102(a). We agree with respondent that receipt of the lot was gross income to petitioners. Whether a transfer is a gift is primarily a question of fact to be determined by an examination of all relevant facts in the record. The most critical consideration, however, is the transferor's intention. Commissioner v. Duberstein,363 U.S. 278, 285 (1960); Thomas L. Johnson,48 T.C. 636, 639 (1967); John N. Hagar,43 T.C. 468, 483-84 (1965). A gift, as that term is used in section 102(a), has been defined as a transfer which proceeds from detached and disinterested generosity, motivated by affection, respect, admiration, charity or like impulses. Commissioner v. Duberstein,supra; Lillian Pascarelli,55 T.C. 1082, 1090 (1971). Judge Shaw had died prior to the trial in the District Court, the record of which was stipulated as evidence in this case. Therefore, of the two corporation representatives who decided to make the transfer of land to petitioner, we have the testimony of only Mr. Gagliardi. The transcript of this trial is the only *422 evidence of record in this case except for stipulations of jurisdictional facts and petitioners' tax return. Mr. Gagliardi's statements are the most dependable and most persuasive evidence of the donor's intention. Mr. Gagliardi was aware that petitioner would not receive a commission from the church for his efforts. In his own words: I suggested to [Judge Shaw] that Mr. Rhodes had done so much work on it for us and had been so helpful, I didn't think it was fair for him to do it for nothing, and we should give him something. I said "Actually, a finder's fee of some kind would be in order." Ken said, Judge Shaw that is, "What have you got in mind," he said, "money, or what?" I said "No, why couldn't we give him a lot? Once we got it plotted and were in a position to deed him a lot, we will give him a lot for his efforts." And that is what we did. The weight of the evidence indicates that Judge Shaw also was motivated in making the transfer of the lot principally by appreciation for the services performed by petitioner which benefited the corporation. Petitioner's own testimony indicates that transfer of the lot was prompted by benefits received by the corporation stemming *423 directly from petitioner's efforts. Petitioner testified that Judge Shaw and Mr. Gagliardi decided to give him the lot not "out of the goodness of their hearts," but because they felt he "deserved something" for his various efforts, including bringing the opportunity to their attention and making arrangements for the meeting with the Cardinal. Any transfer of property might be termed generous where the transfer is not a contractual or legal obligation of the transferor.However, it is well established that this is not the "detached and disinterested" generosity described in Commissioner v. Duberstein,supra. The mere absence of a legal or moral obligation does not conclusively establish a transfer as a gift. Lillian Pascarelli,supra at 1090; John N. Hagar,supra at 483. On a thorough examination of the record before us, we find that the transfer of Lot No. 80 to petitioner did not proceed from detached and disinterested generosity. The transfer was made in consideration of specific services performed by petitioner and substantial economic benefits which resulted to the corporation from those services. This motivation *424 bears no resemblance to affection, respect, admiration or charity, the examples of gift motives catalogued by the Supreme Court in Commissioner v. Duberstein,supra.Therefore, we find that the receipt of Lot No. 80 by petitioner was not the receipt of a gift within the meaning of section 102. It follows that the fair market value of the lot at the time it was transferred to petitioner constitutes gross income to petitioners properly includable in computing their taxable income. In reaching our conclusion, we have studied the cases on which petitioners rely. All but two of these cases were decided before the Supreme Court's decisions in Commissioner v. Duberstein,supra, and Commissioner v. Lo Bue,351 U.S. 243 (1956). They thus share the common weakness of having been decided at a time when the state of the law with respect to the gift exclusion was considerably more confused than it was after these Supreme Court cases. See the discussion in Estate of Mervin G. Pierpont,35 T.C. 65, 67, 69 (1960), with respect to clarification of the law by the Duberstein decision. Furthermore, none of the cases *425 cited by petitioners presents facts sufficiently similar to those in the instant case to persuade us that under such prior decisions we should consider that the transfer of Lot No. 80 to petitioner was a gift. The case primarily relied upon by petitioners is Bogardus v. Commissioner,302 U.S. 34 (1937). This case is clearly factually distinguishable from the instant case. In addition, the Bogardus case must be viewed in the light of the following statement in the Duberstein case (363 U.S. 278 at 285-286): A gift in the statutory sense, on the other hand, proceeds from a "detached and disinterested generosity," Commissioner of Internal Revenue v. Lo Bue, 351 U.S. 243, 246, 76 S. Ct. 800, 803, 100 L. Ed. 1142; "out of affection, respect, admiration, charity or like impulses." Robertson v. United States, supra, 343 U.S. at page 714, 72 S. Ct. at page 996. And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's "intention." Bogardus v. Commissioner, 302 U.S. 34, 43, 58 S. Ct. 61, 65, 82 L. Ed. 32."What controls is the intention with which payment, *426 however voluntary, has been made." Id., 302 U.S. at page 45, 58 S. Ct. at page 66 (dissenting opinion). [Footnote omitted.] The question of whether the transfer here in issue is a gift is principally one of fact to be determined by an examination of the record presented in this case. On the basis of all facts here of record we have found the transfer not to be a gift. Respondent, by amended answer, claimed that petitioners were liable for an addition to tax under section 6653(a). This subsection provides: SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. --If any part of any underpayment (as defined in subsection (c)(1) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. Respondent contends that petitioners' failure to report any income from the receipt of three commission checks totaling $2,250 and from the receipt or sale of Lot No. *427 80 was due to negligence or intentional disregard of rules and regulations. Because respondent first raised this assertion in his amended answer, he bears the burden of proof with respect to the issue.
It was petitioner's testimony that his failure to report as income the commission checks he received was an "oversight," which resulted because his official duties were extraordinarily heavy around the time of preparing and filing his return. He testified that he likewise failed to deduct some substantial interest payments through "oversight." It is clear from this and other evidence that petitioner was aware that he should have reported the commission checks as income. On the basis of the evidence before us, we conclude that petitioner's failure to report the commission income received by him by checks was due to negligence. Certainly, the sole excuse asserted by petitioner, essentially that he was too busy to give his return adequate attention, is wholly inadequate to negate the compelling inference of negligence we find in this record. Because of our finding that failure to report income on receipt of the commission checks was due to negligence or intentional disregard of rules *428 or regulations, we need not consider whether failure to report income from receipt or sale of Lot No. 80 was likewise due to negligence or intentional disregard of rules or regulations. Section 6653(a) requires for application of the addition to tax only that "any part" of the underpayment be so caused. Petitioners are thus liable for the addition to tax as alleged by respondent in his amended answer. Decision will be entered for the respondent as to the deficiency and addition to tax under section 6653(a), and for the petitioners as to addition to tax under section 6653(b). Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. An unreported case (D. N.H. May 28-30, 1974, Criminal No. 73-66).↩
3. Mr. Foyto had never met petitioner before the land purchase opportunity arose.↩
4. However, petitioners did receive an autographed photograph of the Cardinal as a gesture of his appreciation.↩
5. Petitioners do not contest the $2,250 increase attributable to the commission checks, nor certain other adjustments made by respondent not relevant to the issues in this case.↩